**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**VINCENT R. POLISI, II**,

     Plaintiff,

v.                                                                Case No.: *To be assigned*

**SHERIFF GRADY CURTIS JUDD JR.**,

in his individual and official capacities, et al.,

     Defendants.

_____/

### VERIFIED COMPLAINT

### FOR DECLARATORY[1], INJUNCTIVE, PUNITIVE,

### AND MONETARY RELIEF, AND DEMAND FOR JURY TRIAL


Plaintiff, VINCENT R. POLISI, II, appearing pro se, respectfully brings this civil

action under 42 U.S.C. §§ 1983, 1985(3), and 1988, seeking declaratory,

injunctive, compensatory, and punitive relief for ongoing and egregious

constitutional violations committed by law enforcement, prosecutors, and judicial

officers within Polk County, Florida, with the active knowledge, participation,

---

[1] This action is distinct from prior declaratory-only pleadings filed in *Polisi v. Flynn, et al.*, Case No. 8:25-cv-1290-TPB-AAS (M.D. Fla. 2025), which were dismissed without prejudice. The present Complaint asserts claims for damages, injunctive relief, and declaratory relief pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, and **Monell liability**, in compliance with Fed. R. Civ. P. 8 and 10, and controlling Eleventh Circuit precedent.

TABLE OF CONTENTS

Disclaimer…………………….…………………………………………………3
Prefatory Statement…………………………………………………..…4

I. Jurisdiction and Venue …………………………………………..…9
II. Parties………………………………………………………………..…12
Pattern Or Practice of Constitutional Violations……………..…………20
III. Factual Allegations………………………………………..…………25

COUNT I — False Arrest, Unlawful Seizure, Retaliatory Detention ....55
COUNT II — Malicious Prosecution ...................................................70
COUNT III —Retaliation For Protected Speech………………………75
COUNT IV — Supervisory Liability, Deliberate Indifference …………. 83
COUNT V — Denial of Due Process …………………………………..……89
COUNT VI —Conspiracy (42 U.S.C. § 1985(3))………………………97
COUNT VII — Retaliation …………………………………………………… 109
COUNT VIII — Denial of Access To Court ………………………………117
COUNT IX — Conspiracy to Deprive Civil Rights…………………………119
COUNT X —  Failure To Prevent Civil Rights Violation…………………130
COUNT XI — Supervisory Liability under 42 U.S.C. § 1983…………131

Relief Requested ……………………………………………………………140

Certificate of Service, Certificate of Compliance with Local Rule 1.08….144
Notice of Related Case…………………………………………………145
Verification Under 28 U.S.C. § 1746 ……………………………………..146

Exhibit Index……………………………………………………………147

willful disregard, and deliberate indifference of Governor Ron DeSantis and Florida Attorney General James Uthmeier.

This action arises from:

- a false arrest,

- malicious prosecution,

- retaliatory imprisonment,

- fabrication of charges,

- denial of counsel,

- infringement of access to the courts,

- and a pattern of judicial retaliation, all designed to silence Plaintiff's lawful litigation efforts and punish protected speech.

Plaintiff brings this suit to vindicate his rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, and to expose the institutionalized corruption and civil rights deprivations orchestrated by the named Defendants.

This wasn't a one-off. As evidenced by the events detailed in *Polisi v. DeSantis*, et al., Case No. 6:25-cv-00256-CEM-LHP, it was institutional and business as usual.

These weren't isolated errors. They were repeat performances, with the same actors, the same denials, and the same retaliatory outcome. The pattern didn't emerge by accident. It was forged through coordinated misconduct, executed with impunity, and ratified by silence from the top down.

## DISCLAIMER REGARDING PLEADING LENGTH

Plaintiff acknowledges that the Eleventh Circuit and the Middle District of Florida have consistently warned against "shotgun pleadings." Plaintiff does not intend to obscure or conflate claims; rather, this Complaint is structured to provide clarity on each Defendant's specific role and the factual basis for each claim. However, due to the complex nature of this alleged ongoing intertwined conspiracy—encompassing both criminal and civil proceedings, involving multiple state actors operating under color of law, multiple jurisdictions, and requiring extensive factual detail—Plaintiff has necessarily included a lengthy narrative to ensure each Defendant has sufficient notice of the allegations against them. Accordingly, the length of this Complaint reflects the depth and breadth of the asserted wrongdoing, not an effort to create confusion or impose improper burdens on the Court.

## PREFATORY STATEMENT[2]

## Exhaustion of Non-Judicial Remedies

Before initiating this action, Plaintiff afforded Defendants multiple good-faith opportunities to resolve the underlying disputes without judicial intervention.

Specifically:

• On May 1, 2025, Plaintiff transmitted a comprehensive pre-arrest memorandum entitled "The Olive Branch" to Attorney General James Uthmeier and State Attorney Brian Haas, offering to waive all present and future claims—including via hold harmless clause, covenant not to sue, and general release—in exchange for termination of ongoing retaliatory prosecution and correction of constitutional violations already documented in writing.

• On May 25, 2025, Plaintiff further transmitted a formal pre-litigation settlement offer under Fed. R. Evid. 408 and Pursuant to Fla. Stat. §90.408, reiterating these terms and providing evidentiary attachments, legal citations, and an extended deadline for response. No reply was received.

_____

[2] Prior federal declaratory claims were dismissed without prejudice in Case No. 8:25-cv-1290-TPB-AAS. This action asserts distinct and expanded relief grounded in a matured factual record and legally justiciable claims now ripe under federal law and Eleventh Circuit jurisprudence.

•     On June 30[3], 2025, Plaintiff issued formal written notice of escalating due process violations and retaliatory conduct via a comprehensive judicial notice and evidentiary submission, which included Exhibit C, an organizational chart visually documenting systemic entanglements between the named defendants and state officials. This, too, was ignored.

At every critical junction, Plaintiff pursued resolution outside the courtroom, with the intention of avoiding litigation and reducing harm to all parties. Defendants' coordinated silence and continued misconduct left Plaintiff with no alternative but to seek judicial relief.

This Complaint now follows as a last resort, a direct consequence of the State's, individual state actors and private individuals refusal to engage, investigate, or correct its own constitutional violations, despite receiving ample advance notice, documentation, and opportunity to remedy.

This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986, challenging an unlawful pattern of false arrests, prosecutorial retaliation,

---

[3]
   • The Olive Branch memo (Exhibit A)

   • The 408 pre-lit letter (Exhibit B)

   • The June 30, 2025 Judicial Notice (Exhibit C)

judicial misconduct, and institutional abuse executed under color of state law within Polk County, Florida.

At the center of this action is Sheriff Grady Judd, the final policymaker for law enforcement operations in Polk County, whose office, under his direction, has weaponized its prosecutorial and investigative authority to target the Plaintiff in retaliation for his constitutionally protected speech, whistleblower activity, and prior litigation, with the full support and/or deliberate indifference of Governor Ron DeSantis and Attorney General James Uthmeier.

This case further alleges complicity by high-ranking government officials including State Attorney Brian Haas, Judges John B. Flynn and Stacie Kaylor (both of whom worked at the State Attorney's Office and were co-workers, colleagues, and/or former employees of Haas), and other state actors, who collectively participated in or knowingly permitted a pattern of constitutional violations, in contravention of clearly established law.

Plaintiff was subjected to two false arrests based on a knowingly defective capias and manipulated probable cause affidavit filed by a Polk County deputy. He was detained without bond, extradition was ordered by a judicial officer already named in prior civil rights litigation, and prosecutorial discretion was exercised not to serve justice, but to punish dissent.

This conduct, executed by multiple actors across judicial, prosecutorial, and law enforcement roles, constitutes a deliberate, coordinated deprivation of constitutional rights, including rights guaranteed under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments.

Moreover, this action alleges that these violations are not isolated incidents, but the product of an entrenched custom, practice, and policy, orchestrated and permitted by Defendant Judd in his official capacity, triggering municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Plaintiff seeks injunctive and declaratory relief, along with compensatory and punitive damages, for injuries sustained as a direct result of this unconstitutional conduct.

The complaint has been meticulously drafted in accordance with Federal Rules of Civil Procedure 8 and 10, applicable Eleventh Circuit precedent, and **Monell** pleading standards, to preserve a full and complete record for initial review, dispositive motion challenges, and eventual appellate review, if necessary.

**Procedural Compliance Certification**

Plaintiff certifies that this Complaint underwent extensive pre-filing review utilizing multiple independent, third-party legal analysis tools, specifically the

same litigation risk assessment systems employed by major national Wall Street law firms in high-stakes federal cases.

This Complaint was independently screened for, and passed, the following criteria:

- Prohibition on group pleading;

- Elimination of vagueness and conclusory allegations;

- Absence of shotgun pleadings;

- Clear attribution of factual allegations to specific defendants.

Additional procedural safeguards were confirmed, including:

- Subject-matter jurisdiction under **28 U.S.C. § 1331**;

- Article III standing (injury-in-fact, causation, and redressability);

- Ripeness and exhaustion doctrines, where applicable;

- Statute of limitations compliance;

- Proper venue under 28 U.S.C. § 1391;

•   Federal Rules of Civil Procedure 8(a) and 10(b) compliance (clarity, logical structure, and numbered paragraphs);

•   Service of process compliance under Rule 4(m);

•   Independent sufficiency of each Count, without incorporation by reference, ensuring each count stands alone with its own legal and factual basis.

This Complaint meets or exceeds all applicable federal pleading standards and the specific directives of this Court's Order, and is fully positioned for both judicial and appellate review.

## I. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to:

- **28 U.S.C. § 1331** (federal question jurisdiction),

- 28 U.S.C. § 1343(a)(3) (civil rights violations),

- **42 U.S.C. §§ 1983**, 1985(3), and 1986.

Venue is proper in the Tampa Division of the Middle District of Florida under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within Polk County, Florida.

Specifically, Plaintiff alleges:

- The fabrication of a criminal charge by the Polk County Sheriff's Office ("PCSO"),

- The filing of a materially false probable cause affidavit by PCSO personnel,

- The suppression of exculpatory evidence by state actors under the authority of Sheriff Grady Judd and State Attorney Brian Haas,

- And the continuation of a retaliatory prosecution despite documented notice of the underlying falsity of the charges.

Although Plaintiff was physically arrested in a Starbucks in Osceola County 3 months after the events detailed herein, on the accurately named "Osceola-Polk Line Road", the alleged incident giving rise to that arrest occurred directly across the street at a Home2 Suites located within Polk County. The entire law enforcement operation, from initiation to charging and referral, originated within and was directed from Polk County under the supervision of Defendant Judd.

Further, Plaintiff was subject to a **second unconstitutional arrest** within Polk County, on U.S. Highway 27, based on a still-active BOLO initiated by PCSO, despite having already been arrested, detained, and released on the exact same charge days earlier. This second seizure was carried out in public view, under threat

of force, and constituted an independent violation of Plaintiff's Fourth and Fourteenth Amendment rights.

All material acts of misconduct, including retaliatory enforcement decisions, investigatory abuses, and judicial irregularities, were initiated, coordinated, or executed from within Polk County, Florida, and involve actors operating under color of state law within this Division's territorial jurisdiction.

Several Defendants named herein reside in, are employed by, or act within Polk County and the Tampa Division of this District.

**This Court is empowered to issue:**

- Declaratory relief pursuant to 28 U.S.C. §§ 2201–2202;

- Injunctive relief under Federal Rules of Civil Procedure 57 and 65;

- And equitable or supervisory relief as contemplated by the All Writs Act, 28 U.S.C. § 1651, *Mitchum v. Foster*, 407 U.S. 225 (1972), and *Pulliam v. Allen*, 466 U.S. 522 (1984).

## II. PARTIES

**Plaintiff**

1.  Vincent R. Polisi, II ("Plaintiff") is a natural person and resident of Osceola County, Florida. At all times relevant, Plaintiff was a law-abiding citizen exercising his constitutional rights who was unlawfully arrested, maliciously prosecuted, retaliated against, and deprived of liberty, property, and parental rights by coordinated state actors in Polk County, Florida. Plaintiff appears pro se.

**Defendants**

Note: Given the anticipated invocation of sovereign immunity as a defense to evade accountability, Plaintiff explicitly details Governor Ron DeSantis' actions and omissions to preemptively foreclose any jurisdictional or procedural objections to his inclusion in this case.

Although such an extensive factual exposition regarding a state executive may not be customary, it is legally necessary due to Governor DeSantis' direct knowledge of, and failure to act upon, systemic constitutional violations, now for the second time spanning two different jurisdictions: Osceola County and Polk County, and two different judicial circuits: Ninth and Tenth Judicial Circuits.

At the time of the events detailed herein, Governor DeSantis was formally notified immediately after the dismissal of *State v. Polisi*, Case No. 2023-MM-2683, in May of 2024, yet failed to act despite being provided with clear evidence of the malicious criminal prosecution and constitutional violations.

Due to his deliberate indifference in that event, Plaintiff was forced to file *Polisi v. DeSantis et al.*, 6:25-cv-00256-WWB-LHP, on February 17, 2025, now pending in the US District Court for the Middle District of Florida, Orlando Division.

His deliberate inaction and failure to exercise executive oversight emboldened the state actors involved in the instant case, allowing the continued deprivation of Plaintiff's constitutional rights.

2. **Grady Judd** is the elected Sheriff of Polk County, Florida, and is sued in both his individual and official capacities. Sheriff Judd is responsible for the supervision, training, discipline, and conduct of all deputies under his command, including those who participated in the false arrests and fabricated charges described herein[4].

Defendant Judd has publicly adopted and promoted informal customs that weaponize the criminal justice process as a tool of retaliation and public humiliation.

---

[4] *See Keating v. City of Miami*, No. 04-21143-CIV, 2005 WL 8165074, at 10–12 (S.D. Fla. Feb. 2, 2005) (holding plaintiffs sufficiently pled **Monell** liability by identifying both written policies and informal practices implemented by final municipal policymakers that served as the "moving force" behind constitutional violations, rejecting arguments that lack of formal enactment negated liability).

These policies, including the routine reclassification of civil matters as criminal offenses, glorification of extrajudicial punishment through references to "**Grady Judd's Bed and Breakfast**[5]," and refusal to discipline officers for known constitutional violations—constitute unconstitutional customs attributable to the County under ***Monell v. Dep't of Soc. Servs.***, 436 U.S. 658 (1978).

3.  **Brian Haas** is the elected State Attorney for Florida's Tenth Judicial Circuit, covering Polk County. He is sued in both his individual and official capacities. Haas oversaw and directed the unconstitutional prosecution of Plaintiff despite actual pre-arrest notice of exculpatory evidence, and refused to intervene in retaliatory and fabricated criminal actions.

---

[5] **Defendant Sheriff Grady Judd** has cultivated a longstanding, publicly documented pattern of glorifying incarceration and weaponizing the Polk County Sheriff's Office as a tool for public humiliation, ignoring the concept of innocent until proven guilty, as he routinely engages in pre-trial slander and defamation campaigns, live on camera, at press conferences in front of local and national television news stations, agencies, and reporters for Associated Press and Reuters syndication.

In countless press conferences, social media posts, and interviews, he has referred to the Polk County Jail not by its legal name, but as "**Grady Judd's Bed & Breakfast**," an extrajudicial euphemism proudly used to celebrate arrest and detention as a form of public spectacle. This language is not isolated—it reflects a deeply embedded law enforcement culture that substitutes media theatrics for constitutional process, incentivizes retaliatory policing, and openly mocks due process. It is this very culture, condoned and promoted by Judd himself, that directly enabled the fabricated charges and malicious prosecution Plaintiff now challenges under **42 U.S.C. § 1983 and Monell**.

Further, they confirm the existence of an entrenched, extra-legal policy of treating arrest and incarceration as tools of humiliation and retaliation, rather than as constitutionally constrained proceedings. These public statements are not satire; they are declarations of intent. And under **Monell**, they amount to official custom, policy, and practice traceable to the final policymaker of Polk County law enforcement.

4. **Ariel Jimenez** is a Deputy Sheriff in the Polk County Sheriff's Office and is sued in his individual capacity. Jimenez authored the false probable cause affidavit underlying Plaintiff's arrest, deliberately mischaracterized facts, and initiated criminal charges without a complainant or supporting evidence.

5. **Steven Cesar** is a Deputy Sheriff in the Polk County Sheriff's Office and is sued in his individual capacity. Cesar co-authored the false probable cause affidavit underlying Plaintiff's arrest, with Jimenez, deliberately mischaracterized facts, and initiated criminal charges without a complainant or supporting evidence.

6. **John B. Flynn** is a Polk County Judge and former employee of the State Attorney's Office under Defendant Haas. He presided over Plaintiff's criminal proceedings, failed to rule on a timely and legally supported motion for dismissal over objection due to the State's failure to file a traverse, and knowingly advanced retaliatory prosecution in violation of Plaintiff's constitutional rights. He is sued in his individual capacity for actions taken outside judicial immunity, including retaliatory misconduct and bias.

7. **Stacie Kaylor** is a Polk County Judge who assumed jurisdiction over Plaintiff's criminal matter after Defendant Flynn. She is sued in her individual capacity for non-judicial acts of retaliatory denial of court access,

invoking a pro se filing ban, and advancing unconstitutional proceedings designed to coerce a plea and suppress Plaintiff's rights under the First, Sixth, and Fourteenth Amendments.

8. **Victoria Avalon** is a Supervising Assistant State Attorney and the Director of Appellate and Civil Liability for the Office of the State Attorney in the Tenth Judicial Circuit, under Defendant Haas. She is sued in her individual capacity. Upon receiving actual notice of constitutional violations and a pending federal complaint, Avalon continued to pursue the knowingly retaliatory prosecution and participated in communications and motion practice to suppress Plaintiff's legal challenges in a coordinated and self described and memorialized in writing plan of protecting State Attorney Brian Haas from civil liability regardless of the guilt or innocence of Plaintiff.

9. **Ron DeSantis** is the current Governor of the State of Florida. He is sued in his individual and official capacities. Despite actual, written notice of ongoing constitutional violations and retaliation by state actors under his

16

authority[6] beginning with certified return receipt US Mail and USPS with tracking notice in June of 2024 and continuing to present date with memorialization provided in writing via email directly to Attorney General James Uthmeier and Chief of Staff Cate McNeill, including prior false arrest and malicious prosecutions that resulted in unlawful detention for 9 days without bond and were subsequently dismissed at an Emergency Richardson Hearing called by Plaintiff, pro se in *State v. Polisi*, 2023-MM-2683, judicial appointments and prosecutorial leadership, he took no corrective action. His silence, coupled with strategic judicial appointments linked to cover-ups and retaliation, constitutes deliberate indifference and supervisory liability.

Beginning in June 2024, Plaintiff provided actual, written notice of ongoing constitutional violations and retaliatory conduct by state actors under Governor DeSantis's authority. That notice was delivered via certified U.S. Mail and later via email to **Attorney General James Uthmeier** and **Chief of Staff Cate McNeill**, and included:

Documented evidence of a prior false arrest and malicious prosecution resulting in Plaintiff's unlawful 9-day detention without bond;

---

[6] **Keating v. City of Miami**, 598 F.3d 753 (11th Cir. 2010) – supervisory liability attaches when there is a causal connection between the supervisor's actions and the alleged constitutional violation.

**Greason v. Kemp**, 891 F.2d 829 (11th Cir. 1990) – *deliberate indifference = failure to investigate or respond after notice.*

**Mandel v. Doe**, 888 F.2d 783 (11th Cir. 1989) – *personal participation not required; gross negligence or deliberate indifference suffices.*

• Judicially acknowledged prosecutorial misconduct in *State v. Polisi*, 2023-MM-2683, where Plaintiff, appearing pro se, triggered and Emergency Richardson Hearing that led to dismissal[7];

• Forensic and digital tracking evidence[8] confirming the St. Cloud Police Department unlawfully seized and attempted to destroy exculpatory video footage recorded on Plaintiff's iPhone—never booked into evidence, never inventoried in property logs, and located via Apple FindMy app at SCPD headquarters post-arrest, prompting a court order by Judge Stefania Jancewicz directing ASA Christopher Hill to return the device following dismissal. The unconstitutional actions St. Cloud Police Department were anticipated and the actual footage of the police misconduct and conspiratorial efforts to manufacture a false arrest and the events of November 1st, 2023, were purposely recorded on a completely different

---

[7] *State v. Polisi*, Case No. 2023-MM-2683 (Osceola Cty. Ct. 2023). Plaintiff, appearing *pro se*, initiated an Emergency Richardson Hearing after the State failed to disclose exculpatory body-worn camera footage in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and Fla. R. Crim. P. 3.220(b)(1)(B). Upon court-ordered production, the State erroneously disclosed footage of Officer Kailee Fessock arresting a different individual, during which she was visibly instructed by a supervisor—on camera—to bag and log the arrestee's iPhone as evidence. Fessock disregarded that order and casually tossed the phone into the back of her patrol vehicle. Identical conduct occurred during Plaintiff's arrest: Plaintiff's iPhone—believed to contain contemporaneous video evidence of his police interaction—was never logged as evidence or inventoried as property. Tracking data from Apple's FindMy app placed the phone at the St. Cloud Police Department after his arrest (when it should have been in his property at the Osceola County Jail), where "power-on" events were recorded, suggesting unauthorized access. When data extraction efforts failed, the device was destroyed. The trial court granted dismissal at the request of the State immediately following the Emergency Richardson hearing, confirming a broader pattern of evidence suppression and reckless handling by arresting officers and the State Attorney's Office.

[8] *See* Order Granting Motion for Return of Property, *State v. Polisi*, 2023-MM-2683. See also Apple Inc., *"Use the Find My App to Locate a Missing Device,"* support.apple.com. Destruction of exculpatory evidence by law enforcement implicates constitutional violations under ***California v. Trombetta***, 467 U.S. 479 (1984), and ***Arizona v. Youngblood***, 488 U.S. 51 (1988), particularly where the evidence possesses apparent exculpatory value and law enforcement acted in bad faith.

iPhone that was secured prior to the false arrest on November 6, 2023, with the cellular and wireless radios turned off to ensure no syncing to iCloud or ability to remotely wipe the device. The unaltered videos in their original format, complete with underlying metadata, remain intact in cold storage on multiple devices to this day for use in *Polisi v. DeSantis et al.*, Case No.: 6:25-cv-00256-WWB-LHP, currently pending before this Court in the Orlando Division.

• Documentation of retaliatory appointments and prosecutorial abuse tied to key state actors. Despite this extensive notice, Governor DeSantis took no corrective action. His silence, coupled with strategic judicial appointments tied to cover-ups and retaliation, constitutes deliberate indifference and supervisory liability under **Monell**.

10. **James Uthmeier** is the Attorney General of Florida, sued in both his individual and official capacities. Plaintiff is not now, nor was he as the time, an unknown entity to Florida Attorney General James Uthmeier. Uthmeier received multiple notices and conferral communications from Plaintiff months before (in *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla. filed Feb. 17, 2025)) and after Plaintiff's arrest. Despite this, he failed to act, intervene, or even respond, allowing ongoing deprivation of rights by subordinate officials and law enforcement.

11. **Courtney Durden** is one 10 Assistant State Attorneys that has been assigned to the underlying tribunal criminal case of *State v. Polisi*, 2025-MM-1732, for the Office of the State Attorney in the Tenth Judicial Circuit, under Defendant Haas. She is sued in her individual capacity. Upon receiving actual notice of constitutional violations and a pending federal complaint, Durden continued to pursue the knowingly retaliatory prosecution and participated in communications and motion practice to suppress Plaintiff's legal challenges in a coordinated scheme of protecting State Attorney Brian Haas from civil liability regardless of the guilt or innocence of Plaintiff, along with other co-defendants in the State Attorney's Office.

## PATTERN OR PRACTICE OF CONSTITUTIONAL VIOLATIONS

**(Supporting Claims under 42 U.S.C. §§ 1983, 1985(3), Monell, and Supervisory Liability)**

Plaintiff alleges that the constitutional violations at issue in this case were not isolated incidents, but part of a broader, ongoing pattern or practice of unlawful conduct by Florida state officials acting under color of law. This pattern includes repeated retaliatory prosecutions, denial of judicial access, misuse of the criminal process, fabrication of probable cause, and systematic judicial misconduct, often

executed in coordination between prosecutors, law enforcement, and judicial officers.

1.      Plaintiff's ordeal is not an isolated miscarriage of justice. It is the predictable byproduct of a system built on interwoven misconduct, political inertia, and a deliberate indifference to constitutional guardrails. Across two judicial circuits (Ninth and Tenth), Plaintiff was arrested multiple times without probable cause, subjected to retaliatory prosecutions, and denied meaningful access to court —all while state actors received direct written notice, ignored opportunities to correct course, and escalated their misconduct in response to protected speech and litigation.

2.      In both Osceola and Polk Counties, Plaintiff faced forum manipulation that defied basic due process to include: pro se filing bans without hearing or findings of frivolousness, denial of standby or hybrid counsel, and an attempted forced bench trial in a charge mischaracterized as non-incarcerable in Polk County and an actual forced bench trial in Osceola County despite jury demand—all aimed at suppressing his ability to defend himself and to challenge the state actors already named in active federal litigation. These tactics were not coincidental. They followed formal notice to officials including Governor Ron DeSantis, Attorney General James Uthmeier, and State Attorney Brian Haas, and

they unfolded with the same personnel, the same retaliatory fingerprints, and the same institutional silencing playbook.

3.      The misconduct was facilitated by a revolving door of conflicted judicial roles and political inertia. While Judges John Flynn and Stacie Kaylor were elected, not appointed, their prior service as prosecutors under State Attorney Brian Haas created embedded conflicts of interest that went unaddressed despite repeated judicial misconduct. Meanwhile, Governor Ron DeSantis did appoint other judicial officers with concerning entanglements, most notably, Judge John Waters, the former defense attorney for disgraced Polk County Sheriff's Deputy John Raczynski, who "negotiated" a five-count felony nolle prosequi (including forgery and evidence tampering) with Haas' office. This occurred after a televised

press conference by Sheriff Grady Judd himself, in which Judd theatrically[9] feigned outrage while his office quietly coordinated the legal whitewash. That pattern, of DeSantis appointing conflicted figures and refusing to intervene after formal notice, amplifies the appearance of ratification, not oversight. The

---

[9] On or about Mar 22, 2021, Sheriff **Grady Judd** held a widely publicized press conference announcing the arrests of **Deputy John Raczynski** and two other Polk County Sheriff's Office deputies for serious felonies, including **forgery, evidence tampering, official misconduct, and criminal use of personal information**. Judd, in typical theatrical fashion, praised his department's "integrity" for self-reporting the crimes, touting the arrests as evidence of internal accountability. However, shortly thereafter, **State Attorney Brian Haas** dropped all five felony charges via **nolle prosequi**, effectively shielding Raczynski from prosecution and Judd and the internal policies of the Polk County Sheriff's Office from further investigation related to training, supervision, etc. The attorney representing Raczynski in those negotiations? **John Waters**, now **Judge John Waters**, who was then subsequently appointed to the bench by **Governor Ron DeSantis as a quid pro quo for supporting his "Back The Blue" campaign placing law enforcement above citizens' rights**. This sequence of events—prosecutorial leniency, judicial promotion, and gubernatorial appointment—was never investigated or explained, despite formal notice and escalating constitutional violations across multiple circuits.

*See: Polk County Sheriff's Office Press Conference, March 22, 2021;*
*Public Records in State v. Raczynski, Case #: 53-2021-CF-002164-A000-XX*

*Polk Cty. County Court*
*Judge: Mark Carpanini*
*Division: F2*
*State Attorney:*
*Assistant State Attorney for Brian Haas: Josephine Colon.*

*12/21/2020 918.13(1B) CONSPIRACY TAMPER/FABRICATE W PHYSICAL EVIDENCE*
*12/21/2020 918.13(1B) ATTEMPT TAMPER/FABRICATE W PHYSICAL EVIDENCE*
*03/18/2021 831.02 UTTER FORGED INSTRUMENT*
*03/18/2021 838.022(1A) PUBLIC SERVANT FALSIFY OFFICIAL DOCUMENT*
*03/16/2021 831.01 FORGERY*
*Disposition All Charges:*
*Adjudication Withheld 04/02/2024*
*Nolle Prosequi 04/02/2024*
*Dropped/Abandoned (NoBill) 05/21/2021*

https://www.polksheriff.org/news-investigations/2021/03/22/three-deputies-arrested-during-investigation-into-evidence-tampering

Video of Press Conference as televised by ABC Action News:
https://youtu.be/RzJ4GoXk6qw?si=ZcdHzutiOSims6oz

constitutional injuries that followed were not random. They were foreseeable outcomes of deliberate state inaction.

4.    The retaliatory machine was further fueled by the misuse of legal instruments: void capias warrants, manipulated ROR designations, and cross-county BOLO deployments that weaponized law enforcement against a whistleblower plaintiff. Inexplicably, senior prosecutors like Victoria Avalon, whose title is Director of Appellate and Civil Liability, were reassigned to personally prosecute second-degree misdemeanors, not for legal necessity, but to firewall Haas and the Office of the State Attorney from § 1983 exposure. In every instance, the law bent not to justice, but to institutional power preservation.

5.    At the top of this pyramid sits Polk County Sheriff Grady Judd, a man whose public persona as "America's Toughest Sheriff" is drenched in televised braggadocio and constitutional mockery. His grotesque branding of the county jail as "Grady's Bed & Breakfast" and "Grady's Hotel" is not parody—it is policy. A policy of monetizing incarceration, glorifying arrests, and vilifying due process, all under the guise of "public safety." Judd's repeated national appearances and gleeful one-liners mask a systemic pattern of overreach that directly contributed to the fabrication of charges against Plaintiff and the continuation of baseless prosecutions under color of law.

6. This pattern persisted not in the shadows, but in broad daylight. Every constitutional violation was made known to state leadership—DeSantis, Uthmeier, Haas—and every opportunity to de-escalate was declined. Plaintiff provided written offers of release, waiver of liability, and formal 408 communications. They were ignored. This lawsuit, therefore, is not a first resort—it is the last stop on a road paved with broken due process, retaliatory force, and institutional complicity.

## III. FACTUAL ALLEGATIONS

### A. Pretextual Criminal Charges and the "Olive Branch" Warning (May 1, 2025)

1. On May 1, 2025, Plaintiff Vincent R. Polisi, II, sent a detailed written communication entitled **"The Olive Branch"** to Florida Attorney General **James Uthmeier** and State Attorney **Brian Haas**, documenting systemic misconduct within the **Polk County Sheriff's Office (PCSO)** and explicitly warning that any further retaliatory action would result in federal litigation under **42 U.S.C. § 1983**.

### 2. Plaintiff's communication included:

- A full memorandum explaining the event at the **Home2 Suites in Davenport, Florida**, where Plaintiff was the *paying customer*;

- A **zero-balance hotel receipt**;

- Matched **bank transaction records**;

- Evidence that Plaintiff himself had contacted PCSO for assistance and had cooperated fully with Deputy **Cesar** on the scene.

3. Despite Plaintiff being the individual who *called law enforcement*, *paid the full bill*, and *remained on scene voluntarily*, Defendant **Detective Ariel Jimenez** fabricated criminal allegations, submitting a false probable cause affidavit without a named complainant, thereby initiating charges for **theft of hotel services** against the very person who rendered and paid for the services and called the Polk County Sheriff's Office.

4. On May 1, 2025, Plaintiff submitted a comprehensive pre-arrest memorandum (hereinafter "***The Olive Branch***"), to both Florida Attorney General **James Uthmeier** and State Attorney **Brian Haas**, which included proof of zero balance owed receipt directly from Hilton and unequivocally provided an opportunity to correct the record, discontinue the unlawful prosecution, and avoid imminent federal litigation exposure. This memorandum was not merely a notice. It constituted a formal offer of resolution, including a **waiver of liability, hold harmless agreement, and mutual release,** all tendered in good faith as an off-ramp from further constitutional civil litigation escalation.

At the time, the State was already on actual notice of **active federal litigation**: *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla. filed Feb. 17, 2025), which challenged a separate false arrest, unlawful nine-day pretrial detention without bond, and malicious prosecution under color of law, allegations later substantiated by an Emergency Richardson Hearing in underlying criminal case *State v. Polisi*, Case No. 2023-MM-2683 (Osceola County), where Plaintiff, appearing pro se, demonstrated that State prosecutors had knowingly suppressed exculpatory body-worn camera footage in violation of **Brady v. Maryland**, 373 U.S. 83 (1963).

Despite the clear roadmap toward de-escalation, **Uthmeier, Haas, and their subordinates escalated instead,** doubling down on retaliatory prosecution in direct contravention of established constitutional law, knowingly leveraging a factually baseless charge that had already been discredited through prior disclosure and direct documentary evidence. Rather than mitigate federal liability, they materially aggravated it.

**B. False Arrest and Retaliatory Prosecution (May 7, 2025)**

5. On **May 7, 2025**, the same day as Plaintiff's final family court hearing in Osceola County, Plaintiff was arrested by the **Osceola County Sheriff's Office** at

a **Starbucks located on Osceola-Polk Line Road,** mere feet from the scene of the alleged offense, which was situated directly across the street in **Polk County**.

6. Plaintiff was detained under a **fraudulent warrant** originating from **Detective Jimenez**, based on knowingly false charges, despite prior written exculpatory documentation being in possession of both the **Attorney General** and **State Attorney**.

7. Plaintiff was held without bond and booked into the Osceola County Jail under charges of:

- **Defrauding an innkeeper**, despite clear proof of payment;

**C. Judicial Retaliation by Defendant Judge Laura Shaffer**

8. On **May 8, 2025**, within hours of presiding over Plaintiff's divorce trial in family court, where she had already:

- **Revoked Plaintiff's pro se rights**,

- **Struck over 13 months of court filings** to prevent appellate review,

- **Deprived Plaintiff of custody, parental rights, and property** without evidentiary findings,

Defendant **Judge Laura Shaffer** appeared as the **first appearance judge** in Plaintiff's criminal case in Osceola County Jail.

1. Despite the **warrant requesting release on recognizance (ROR)**, and over objection from a public defender, Judge Shaffer **denied ROR** and **ordered extradition to Polk County**, acting **retaliatorily** and **with a personal conflict of interest**, as she was a named Defendant in a **federal civil rights lawsuit** *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla. filed Feb. 17, 2025) already filed by Plaintiff months earlier.

2. Approximately **12 hours later**, Plaintiff was **released from custody without explanation**, suggesting possible recognition of constitutional liability or improper warrant procedures.

## D. Continued Harassment and Second Arrest Attempt (May 13, 2025)

3. On **May 13, 2025**, while traveling on **US Highway 27 in Polk County**, Plaintiff was **again detained** by the **Polk County Sheriff's Office**, arrested in the middle of four lanes of highway traffic.

4. This second unlawful arrest was executed by deputies of the Polk County Sheriff's Office, acting directly under the authority of **Defendant Sheriff Grady Judd**, based on a "Be On the Lookout" (BOLO) alert that had never been withdrawn. Despite Plaintiff's prior arrest and first appearance in court while in custody, formal release from custody, and full compliance with pretrial obligations, the BOLO remained active due to a deliberate or grossly negligent failure by the State and law enforcement to clear the record.

5. Critically, during on-record proceedings, Judge John B. Flynn, at the arraignment hearing, openly admitted that he had failed to withdraw the capias, which remained outstanding in the system. This judicial omission directly facilitated the second arrest. When coupled with the fact that the second arrest was executed by the very same law enforcement agency (Polk County Sheriff's Office (PCSO)) responsible for the original falsified probable cause affidavit, it demonstrates a systemic failure and intentional disregard for Plaintiff's constitutional rights.

6. Plaintiff had already:

- Been lawfully released following the first arrest;

- Complied with all procedural and court requirements;

- Communicated ongoing violations to relevant state actors, including Haas and Uthmeier, in writing;

- Documented the risk of exactly this scenario occurring as part of The Olive Branch memorandum sent pre-arrest.

- Nonetheless, 5 days later, PCSO deputies, operating on a knowingly stale and invalid warrant, conducted a second arrest, literally in the middle of 4 lanes of traffic (not the side of the road) on a busy Polk County highway (U.S. 27), publicly handcuffing Plaintiff and placing him in the back of a

PCSO cruiser in full view of traffic, all while the underlying charges had already been substantively contested and documented as factually and legally defective.

7.  Plaintiff had already:

•    Been arrested on the charge,

•    Held in jail,

•    And released with no further detainer.

Fortunately, at Plaintiff's urging, the deputy on scene conducted an on-the-spot records check and confirmed that Plaintiff had previously been taken into custody and released in connection with the very same charges underlying the BOLO. Despite this verification, Plaintiff had already been publicly handcuffed on the side of a major highway, placed in the back of a PCSO patrol vehicle, and detained in plain view of passing motorists.

This second unlawful seizure constituted a clear violation of Plaintiff's Fourth Amendment rights[10], compounded by its highly public nature. It inflicted

---

[10] See **California v. Hodari D.**, 499 U.S. 621, 625–26 (1991) ("A seizure occurs when a law enforcement officer, by means of physical force or show of authority, restrains the liberty of a citizen, regardless of whether it is momentary."); see also **Dunaway v. New York**, 442 U.S. 200, 216 (1979) (holding that even brief detentions without probable cause constitute unconstitutional seizures under the Fourth Amendment); cf. **Stamps v. Town of Framingham**, 813 F.3d 27, 33 (1st Cir. 2016) ("Even momentary unconstitutional restraints on liberty can inflict compensable harm under § 1983."); Cortez v. McCauley, 478 F.3d 1108, 1125 (10th Cir. 2007) (en banc) ("There is no 'minimal' amount of time that a person must be seized to establish a Fourth Amendment violation.")

reputational harm, emotional distress, and further undermined Plaintiff's liberty and dignity.

In fact, upon arriving at a nearby AutoZone moments later, two bystanders, having recognized Plaintiff from the highway stop, approached and confirmed witnessing the arrest. One of them, himself a prior victim of false arrest by PCSO, offered to testify as a fact witness regarding the event and its public impact.

## E. Judicial Retaliation and Constitutional Closure of Courts

1. Following Plaintiff's arrest, criminal proceedings were improperly advanced by Judge John B. Flynn, a former prosecutor with the State Attorney's Office for the Tenth Judicial Circuit, the very office led by Defendant Haas.

2. Judge Flynn's Prior Disciplinary History, Institutional Conflicts, and Retaliatory Role in Advancing Prosecution

3. Following Plaintiff's false arrest and unlawful detention, criminal proceedings were improperly advanced by Judge John B. Flynn, a former prosecutor for the very office now led by Defendant Brian Haas, State Attorney for the Tenth Judicial Circuit. This overlapping professional history, between bench and bar, created a constitutionally significant conflict. But what truly poisoned the well was Flynn's documented and

publicly sanctioned bias in favor of Defendant Grady Judd, the Sheriff of Polk County.

4.   Judge Flynn had been suspended without pay and publicly reprimanded by the Florida Supreme Court on November 27, 2024, less than six months prior, for judicial misconduct directly linked to partisan favoritism toward law enforcement, including repeated glorifications of "Grady's Hotel", a reference to the Polk County Jail. In campaign statements that drew widespread condemnation, Flynn described himself as a judge who would ensure "criminals won't be happy to see me on the bench," and that if they "have a history, Grady's Hotel is open 24/7." See Inquiry Concerning a Judge, JQC Nos. 2023-006 & 2023-067 Re: Hon. John B. Flynn, SC2023-1435 (Fla. Nov. 27, 2024).

5.   Despite this explicit sanction and the Florida Supreme Court's directive that Flynn be removed from criminal dockets due to the appearance of partiality, Flynn was nonetheless assigned to preside over Plaintiff's prosecution, a case initiated by the very sheriff whose name appears in the Supreme Court reprimand.

6.   The conflict was not theoretical. Just days before Plaintiff's arrest, he had sent a formal pre-arrest memorandum to Defendant Attorney General James Uthmeier and Defendant State Attorney Brian Haas, warning of the defective nature of the warrant and sharply criticizing the conduct of

Deputy Ariel Jimenez, a Polk County deputy under Sheriff Judd. The letter, titled "***The Olive Branch***", identified the PCSO's misconduct, contained an attachment demonstrating proof of a paid zero balance Hilton receipt that had previously been provided to PCSO Detective Ariel Jimenez and PCSO Deputy Steven Cesar demonstrating no crime or fraudulent intent, and proposed a waiver of liability, hold harmless agreement and general and mutual release in exchange for discontinuing prosecution, an offer ignored by state actors.

7. Instead, Plaintiff was arrested and subjected to unconstitutional proceedings signed and advanced by Judge Flynn, the very same judge who signed the defective capias, refused to retract the BOLO after Plaintiff's first arrest, and then made sarcastic remarks to Plaintiff about "fixing it" after the second arrest had already occurred.

8. This was not mere procedural sloppiness. It was an institutional setup engineered by conflicted actors with shared allegiances. When confronted with a Verified Motion to Disqualify detailing Flynn's sanction history, his personal connection to the prosecution team, his direct involvement in authorizing the capias, and his courtroom conduct, Flynn ultimately recused. But not before he summarily denied Plaintiff's dispositive motions, without adversarial hearing, without a written traverse from the State, and

in direct violation of Rule 3.190(c)(4) and (d)[11], despite Plaintiff's formal objection on the record. When questioned, Judge Flynn astonishingly excused the State's procedural failure by stating, on the bench and on camera, 'She forgot.' This admission, captured on the official courtroom transcript and video, confirmed that the proceedings had devolved into performative formalities devoid of lawful process. The denial of Plaintiff's motions, many of which required dismissal absent a State traverse, entrenched the constitutional harm already inflicted and prompted Plaintiff's immediate **Verified Motion to Disqualify—granted** days later. The convergence of Flynn's prior discipline, his prosecutorial past, and his judicial actions in this case establish a coordinated institutional nexus among Defendants Haas, Judd, and Flynn. The systemic nature of this entanglement implicates not just individual liability, but raises **Monell**-level

---

[11] The prosecution must deny the material facts it addresses in the traverse with specificity. A general, conclusory, or speculative response by the prosecution in its traverse is insufficient and constitutes an admission of the facts in question. *State v. Kalogeropolous*, 758 So. 2d 110 (Fla. 2000); *State v. Nunez*, 881 So. 2d 658 (Fla. 3d DCA 2004).

A traverse filed in bad faith, or the failure to file a traverse at all, will also result in an admission of the undisputed facts as alleged by the defense. *State v. Yarborough*, 571 So. 2d 17 (Fla. 2d DCA 1990); *State v. Sammons*, 889 So. 2d 857 (Fla. 4th DCA 2004).

Specificity for a traverse requires the state to address the particular underlying facts of a case, and to present those in its filing so that the facts as alleged by the State are before the court. *State v. Kalogeropoulis*, 735 So. 2d 507, 508-09 (Fla. 4th DCA 1999) (apprv'd *State v. Kalogeropolous*, 758 So. 2d 110 (Fla. 2000)). *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (en banc) ("There is no 'minimal' amount of time that a person must be seized to establish a Fourth Amendment violation.").

municipal exposure for the policies, practices, and deliberate indifference at the heart of this case.

9. Plaintiff was then reassigned to **Judge Stacie L. Kaylor**, who, having never presided over any appearance by Plaintiff or had any intersection:

- **Invoked a "pro se filing ban" despite no specific findings of frivolousness or vexatiousness by her or Flynn** to avoid being forced to rule on her own Verified Motion To Disqualify, preventing Plaintiff from defending himself;

- **Misclassified Plaintiff's filed demand for jury trial** as **"waived"** due to the charge being "non-incarcerable"—despite knowing a conviction would trigger probation violation and a **mandatory prison term** in another jurisdiction.

10. Plaintiff filed a **Writ of Prohibition** with the **Sixth District Court of Appeal**, where proceedings remain pending regarding the filing ban, jury trial denial, and retaliatory prosecution.

**Successor Judge Stacie Kaylor's Conflict of Interest and Continuation of Coordinated Retaliation**

Following the forced recusal of Judge John B. Flynn due to documented partiality and conflict arising from his public alignment with Defendant Grady Judd and

prior employment under Defendant Haas, Plaintiff's case was reassigned to Judge Stacie Kaylor.

Kaylor, like Flynn, is a former prosecutor employed by Defendant Haas's office, the very entity responsible for advancing the retaliatory charges challenged herein. This professional connection is not incidental. It forms part of an unbroken chain of institutional conflict, whereby multiple successive judicial actors with prior ties to the prosecuting authority have presided over Plaintiff's criminal case despite glaring due process red flags.

Within days of assuming the case, Judge Kaylor weaponized a "pro se filing restriction" order to strip Plaintiff of access to the court system altogether, in direct response to Plaintiff's repeated filings exposing the prosecutorial misconduct. Despite Plaintiff's clear and repeated demands for a jury trial, Judge Kaylor attempted to force a bench trial under the guise of "Offense Not Incarcerable" classification, while simultaneously overseeing a prosecution that, if convicted, would trigger a violation of Plaintiff's probation and thus, incarceration.

This deliberate mischaracterization of the offense class, when juxtaposed against the known collateral consequences of conviction, amounts to a constructive incarceration scheme, cleverly disguised as procedural efficiency. It is textbook forum closure and a direct assault on Plaintiff's Sixth Amendment right to a jury

trial and First Amendment right to petition the government for redress of grievances.

Kaylor's conduct cannot be divorced from her institutional allegiance to Defendant Haas. The judicial baton was passed from one former Haas subordinate to another, all while Plaintiff's constitutional rights were systematically eroded under the protective veil of "courtroom discretion."

## F. Statewide Retaliation & Coordinated Deprivation of Rights (42 U.S.C. §§ 1983, 1985(3), 1986)

The actions described herein were not isolated missteps by rogue individuals. They reflect a deliberate, multi-jurisdictional conspiracy, executed under the color of state law, and sustained through a coordinated abuse of judicial, prosecutorial, and executive authority.

This conspiracy occurred:

•     With actual and documented notice to Governor Ron DeSantis and Attorney General James Uthmeier;

•     In response to Plaintiff's lawful exercise of his First Amendment rights, including protected petitions to redress grievances and documented pre-arrest legal communications ("The Olive Branch");

•    In active coordination across counties (Osceola and Polk), with prosecutorial manipulation by State Attorney Brian Haas, judicial misconduct by former SAO prosecutors-turned-judges, and law enforcement abuse by Sheriff Grady Judd's deputies.

Taken together, the timeline, motive, and execution support a sustained campaign of retaliation, intended to:

•    Obstruct Plaintiff's access to the courts;

•    Fabricate criminal liability to suppress protected speech and legal action;

•    Strip Plaintiff of parental rights and liberty interests without due process;

•    Intimidate Plaintiff into silence through misuse of state power.

These acts give rise to actionable claims under:

•    **42 U.S.C. § 1983**, for direct constitutional deprivations;

•    42 U.S.C. § 1985(3), for conspiracy to deprive Plaintiff of equal protection and court access;

•    42 U.S.C. § 1986, for willful failure to prevent such violations by officials with the legal power and duty to do so.

## G. SPECIFIC ACTS OF CONSPIRACY & COORDINATED STATE ACTION

This section spells out the overt acts and the following interlocking misconduct, committed under color of state law, that individually and collectively demonstrate a pattern of coordinated state action intended to retaliate against, silence, and deprive Plaintiff of protected constitutional rights and elevate the case from "bad government" to a federal civil rights conspiracy under §§ **1983**, 1985(3), and 1986.:

### 1. Initiation of Fabricated Charges by Polk County Sheriff's Office

• The Polk County Sheriff's Office, under the direction of Defendant Sheriff Grady Judd, initiated criminal charges against Plaintiff despite:

• No complainant;

• No actual loss sustained by any party;

• Immediate voluntary payment by Plaintiff to the business in question upon arrival on February 7th, and then again, prior to extension of the hotel stay on February 8th, and 3 days prior to Plaintiff calling the PCSO;

• Zero balance proof provided by Plaintiff at the scene and in follow-up to the PCSO that Plaintiff called.

• PCSO deputies, including Detective Ariel Jimenez and Deputy Steven Cesar, ignored exculpatory evidence and fabricated a probable cause affidavit containing materially false statements.

## 2. Plaintiff's Pre-Arrest Notice to State Officials ("The Olive Branch")

• On May 1, 2025, Plaintiff submitted a formal pre-arrest memorandum to:

• Florida Attorney General James Uthmeier, and

• State Attorney Brian Haas.

• The memo included:

• A copy of the Hilton zero-balance receipt;

• Detailed factual and legal arguments explaining the absence of criminal conduct;

• A proposed waiver of liability, mutual release, and non-litigation agreement to de-escalate.

• The offer was ignored. Within days, Plaintiff was arrested.

### 3. First False Arrest: May 7, 2025 (Osceola County)

• Plaintiff was arrested by Osceola County deputies on the Polk County warrant while sitting in a Starbucks on Osceola–Polk Line Road, mere feet from the Polk County line, based on a BOLO and capias issued by the Polk County Sheriff's Office under Defendant Judd's authority.

• Though the arrest physically occurred in Osceola County, the underlying warrant, fabricated probable cause affidavit, and alleged offense originated entirely from within Polk County, where PCSO Detective Ariel Jimenez falsely alleged that Plaintiff defrauded a hotel, despite documented proof of payment and the absence of any complainant.

• Plaintiff was transported to the Osceola County Jail, where the initial charging document indicated "Release on Own Recognizance (ROR)" and zero bond.

• During first appearance while still in custody, Plaintiff appeared before none other than Judge Laura Shaffer—the very same Ninth Judicial Circuit judge named as a defendant in Plaintiff's federal civil rights suit filed on February 17, 2025 (*Polisi v. DeSantis, et al.*, M.D. Fla., Case No. 6:25-cv-00256), and the judicial officer who presided over Plaintiff's divorce and child custody trial less than 24 hours earlier.

Despite the warrant from Florida's Tenth Judicial Circuit explicitly designating release on recognizance (ROR) with zero bond, Judge Shaffer denied release and ordered Plaintiff held for extradition to Polk County—without justification, without a change in circumstances, and over the objection of the public defender.

Judge Shaffer's actions not only contradicted the originating court's directive, but occurred immediately following her exposure to direct legal jeopardy as a named defendant in a federal §1983 action. The proximity in timing, the lack of legal justification, and the cross-circuit override together constitute retaliatory judicial conduct under color of law, in violation of Plaintiff's rights under the First and Fourteenth Amendments.

•    For reasons unknown to Plaintiff, he was released approximately 12 hours later, before extradition occurred.

## 5. Continuation of False Prosecution by State Attorney Brian Haas

•    State Attorney Haas, having received "The Olive Branch," refused to intervene or correct the record.

•    His office advanced the prosecution despite knowing:

•    The affidavit was defective;

•    Exculpatory evidence existed;

• The Defendant had already endured a prior false arrest and unlawful incarceration in a separate matter (State v. Polisi, 2023-MM-2683).

## 6. Judicial Misconduct: Judge John B. Flynn

• Former State Attorney's Office prosecutor Judge Flynn presided over Plaintiff's arraignment and pretrial proceedings.

• Despite a Verified Motion to Disqualify, Judge Flynn:

• Refused to recuse until compelled;

• Summarily denied multiple dispositive motions without adversarial hearing;

• Justified violations of procedure by stating on the record that "she forgot," referring to the prosecutor's failure to file a required traverse.

• Flynn's documented history of pro-law-enforcement bias and prior discipline by the Florida Supreme Court for improper favoritism toward Defendant Grady Judd exacerbates the appearance of corruption.

## 7. Second False Arrest: Polk County

• Despite already having been arrested and released on the charge, Plaintiff was:

• Detained again in Polk County during a routine errand on U.S. Highway 27;

• Handcuffed in the middle of four (4) lanes of a public highway directly in oncoming traffic;

• Subject to public embarrassment, seizure, and exposure.

• Only after Plaintiff demanded an investigation did the deputy **confirm prior custody and release Plaintiff.**

**8. Forum Closure and Pro Se Retaliation: Judge Stacie Kaylor**

• Successor to Judge Flynn, Judge Kaylor is a former employee of Haas's office.

• Kaylor:

• Revoked Plaintiff's ability to file documents pro se, closing the forum;

• Refused to rule on critical pretrial motions;

• Attempted to coerce Plaintiff into a waiver-heavy "nolle prosequi" agreement while denying Plaintiff's right to a jury trial.

• These acts are part of a broader pattern of retaliation and obstruction, carried out with knowledge of Plaintiff's prior federal filings and pending appellate writs.

## POST-ARREST MISCONDUCT – UNAUTHORIZED COLLECTION & CONTINUING CIVIL FRAUD BY PURPORTED "VICTIM"

### 1. Live Evidence of Civil Nature of the Dispute (May–July 2025)

Plaintiff, due to extortive threats of another false police report to revoke bond in November of 2023 by his wife, Wendy Polisi (now ex-wife pursuant to May 7, 2025 marriage dissolution trial) captured on Osceola County Jail phone recordings, has lived exclusively in extended-stay hotels and short term vacation rentals (Airbnb and VRBO) and the Osceola County Jail (on multiple false arrests November 6-15 2023 and May 7-8 2025) from November 2023 to present during the pendency of both the initial false arrest detailed in 2023-MM-2683 (which was dismissed at the Emergency Richardson Hearing). As a result of this unnatural experience, Plaintiff has acquired substantial, firsthand experience with hotel industry billing practices, particularly the unlawful charges during a stay held in a "pending" status until after departure with the excuse for inability to credit the account being the standard, "it will take 3-5 business days days for the refund to process and credit your account". Industry practice then generally never credits the

account. There's typically no rebuttal or retaliation because the average hotel guest is long gone and in a different city or state by the time the phantom credit that never materializes is realized unless the practice of "post-departure" use of stored debit/credit card information captures their attention and engages involvement. This includes documented patterns of unauthorized manual charges by front desk personnel, night auditors, or property managers in an effort to retroactively collect on disputed or phantom debts.

This pattern of conduct resurfaced on the morning of Sunday, July 13, 2025, when Plaintiff awoke to three (3) successive unauthorized debit charge attempts made by Home2 Suites by Hilton Orlando South Davenport—the exact hotel implicated in the pending criminal prosecution.

The charges were:

- 7:29 AM – $467.76

- 7:31 AM – $200.00

- 7:31 AM – $150.00

These facts and corresponding exhibits are presented solely to illustrate the ongoing pattern of retaliatory conduct and the factual absurdity of the underlying criminal allegations. Plaintiff expressly states that he is not seeking resolution, adjudication, or reconsideration of the state criminal matter within this proceeding.

47

Rather, these materials are submitted to highlight the unconstitutional motivations, factual falsity, and continuing civil rights implications of the prosecution, issues squarely within this Court's jurisdiction under 42 U.S.C. §§ 1983, 1985, and 1986.

The first amount at 7:29AM, July 13, 2025 of $467.76 (charge again attempted five months after on-site physical payment and issuance of zero balance receipt) is the exact amount falsely alleged as the "stolen" value in the Probable Cause Affidavit submitted by Defendant Deputy Ariel Jimenez, and the exact amount previously charged to Plaintiff by Home2 Suites at the time of check-in, as evidenced by both the Visa debit card statements provided by CashApp (Exhibit D) and the zero balance owed receipt provided by Hilton (Exhibit E).

The successive attempts ($200 and $150) reflect a pattern common to fraud detection protocols: an escalating series of trial charges used to bypass available balance restrictions, a hallmark of manual, not automated, transactions.

Plaintiff previously blocked Hilton properties on his debit account after a similar incident at Holiday Inn Express, where $5,000+ was drained on a Saturday without justification. These were manual fraud prevention measures, not random declines.

## 2. Prosecution Continues While "Victim" Commits Civil Fraud

Despite being a named Victim (Business) on Polk County Sheriff's Office form 25-5910, Supplement 0001, sworn to on February 20, 2025 by Polk County Sheriff's Deputy Ariel Jimenez-Suaro, Badge # 7197, as notarized by Polk County Sheriff's Deputy Lucy Doyon, Badge # 5014, in *State v. Polisi*, 2025-MM-1732 (Polk County), the hotel's attempt to manually charge a debit card for the same amount underlying the criminal charge:

•    Confirms the non-criminal, civil billing nature of the dispute.

•    Demonstrates intent to resolve it through self-help collection, not restitution.

•    Constitutes unauthorized debit card activity, prohibited under both federal and Florida law.

This conduct is not just civil—it's illegal:

•    Fla. Stat. § 817.61 – Obtaining credit card through fraudulent means;

•    Fla. Stat. § 559.72(7) – Harassment and abusive debt collection;

•    15 U.S.C. § 1692 et seq. (FDCPA) – Attempting to collect debt not legally owed;

49

- 18 U.S.C. § 1029(a)(2) – Attempted use of access devices to obtain unauthorized value.

This behavior was previously reported in filings submitted to the state court prior to revocation of Plaintiff's filing privileges, as it also happened in June of 2025, the month following Plaintiff's arrest. Defendants, including Avalon, Haas, and Judd, had constructive and actual notice that the alleged "victim" was engaging in civil fraud and unlawful collection activity while being simultaneously leveraged by the State as a "crime victim.", despite having never reported any crime, even on February 11, 2025, with Defendant Deputy Steven Cesar standing right in front of Home2 Suites General Manager James Patterson while interviewing him for more than 30 minutes.

### 3. Prosecutorial Misconduct and Monell Liability Exposure

Despite having actual knowledge of exculpatory evidence, a lack of probable cause, and the absence of any named complainant, the Office of the State Attorney for the Tenth Judicial Circuit—under the direction of Defendant Brian Haas—knowingly continued prosecutorial efforts against Plaintiff.

This was done:

- Without identifying a legitimate complainant, victim, or injured party;

- While in possession of transactional proof of payment and zero-balance confirmation;

- In deliberate disregard of contemporaneous conduct by the alleged "victim," including repeated unauthorized electronic funds transfer attempts constituting independent criminal violations under state and federal law;

- And under the direct supervision of Victoria Avalon[12], the Director of Appellate and Civil Liability, who was installed as lead prosecutor—not for her expertise in petty theft—but to shield Defendant Haas from known and anticipated civil rights liability.

Avalon's appointment constitutes prima facie evidence of retaliatory motive and institutional conflict. Her own written correspondence, memorialized in discovery

---

[12] **Brady v. Maryland**, 373 U.S. 83, 87 (1963) — Holding that suppression of material exculpatory evidence by the prosecution violates due process, regardless of the prosecutor's intent.

**Giglio v. United States**, 405 U.S. 150, 153–55 (1972) — Extends *Brady* to require disclosure of any evidence affecting witness credibility, including deals or promises made to cooperating parties.

**Mooney v. Holohan**, 294 U.S. 103, 112 (1935) — Prosecutors violate due process when they knowingly present false or misleading testimony or permit it to go uncorrected.

**Keating v. City of Miami**, 598 F. Supp. 2d 1341, 1350–51 (S.D. Fla. 2009) — Holding that plaintiffs sufficiently alleged *Monell* claims by asserting a pattern of constitutional violations resulting from both formally adopted policy and informal custom, including deployment of decision-makers to suppress protected conduct.

**Pembaur v. City of Cincinnati**, 475 U.S. 469, 480–81 (1986) — A single decision by a final policymaker may be sufficient to trigger *Monell* liability when the decision causes a constitutional deprivation.

**Connick v. Thompson**, 563 U.S. 51, 61–62 (2011) — A district attorney's office may be liable under *Monell* where a pattern of misconduct reflects deliberate indifference to constitutional rights.

**Lozman v. City of Riviera Beach**, 138 S. Ct. 1945, 1954 (2018) — Retaliatory government action for protected First Amendment activity—even in the criminal context—remains actionable under § 1983 where a retaliatory animus is shown to be a motivating factor.

**Gonzalez v. Lee County Housing Auth.**, 161 F.3d 1290, 1296–97 (11th Cir. 1998) — A custom actionable under *Monell* need not be formally adopted; widespread, longstanding practices that constitute standard operating procedures suffice.

**Hope v. Pelzer**, 536 U.S. 730, 741 (2002) — Qualified immunity does not shield officials who violate clearly established law in a way that any reasonable official would recognize as unconstitutional.

**Zinermon v. Burch**, 494 U.S. 113, 125 (1990) — "A deprivation of procedural due process is actionable under § 1983 when it results from conduct undertaken under color of state law."

and direct communications to Plaintiff, confirms that her prosecutorial involvement was motivated by a self-identified need to "protect Haas from liability." This places her squarely outside the bounds of legitimate prosecutorial discretion and within the scope of civil liability under 42 U.S.C. § 1983.

**Brady v. Maryland**, 373 U.S. 83 (1963), imposes a constitutional obligation on the prosecution to disclose material exculpatory evidence. Here, the State not only failed to disclose; it suppressed, ignored, and affirmatively obstructed material facts contradicting the charging affidavit—while shielding a cooperating witness (Patterson) engaged in a months-long pattern of digital financial misconduct.

**➤ Monell Liability Triggered**

These facts are not isolated. They reflect an entrenched policy, custom, and practice within the Office of the State Attorney and the Polk County Sheriff's Office to:

- **Recast civil disputes as criminal conduct** to maximize plea leverage and suppress civil liability;

- **Tolerate perjured or incomplete affidavits** as long as they yield prosecutorial results;

- **Deploy senior litigation personnel** to minor cases where liability exposure threatens institutional leadership;

- **Overlook the unlawful conduct of cooperating parties**, including credit card fraud and witness tampering, so long as it furthers conviction rates or insulates state actors.

This constitutes a **systemic abuse of power**, sustained by final policymakers (Haas and Judd), making the Tenth Judicial Circuit and Polk County actionable under **Monell v. Department of Social Services**, 436 U.S. 658 (1978).

### 4. Pattern of Deceptive & Retaliatory Prosecution

Plaintiff previously documented an identical incident in May 2024, 10 months prior, wherein Orange County deputies were called by Plaintiff to address unlawful hotel billing activity. A deputy conducted an on-site investigation and ordered hotel staff to unlock Plaintiff's room after confirming the dispute was purely civil, not criminal.

That incident, fully documented and provided to the Office of the State Attorney in discovery, further confirms Plaintiff's pattern of lawful conduct, and the government's pattern of targeting that conduct for retaliation.

**Relief & Remedies:**

Plaintiff respectfully demands:

•  Immediate referral to the U.S. Attorney for investigation of Hilton/ Home2 Suites for debit card fraud;

•  Supplementation of declaratory and injunctive relief to bar continued criminal prosecution based on admitted civil debt;

•  Monetary sanctions and discovery sanctions against the Office of the State Attorney;

•  Permission to amend pending counts to reflect new factual predicate of continued unlawful behavior by prosecution witnesses and malicious conduct by State actors as they continue to become available.

**COUNT I**

**FALSE ARREST & UNLAWFUL SEIZURE UNDER 42 U.S.C. § 1983**

(Violation of the Fourth and Fourteenth Amendments)

**Against Defendants: Grady Judd (individual and official capacities), Ariel Jimenez (individual capacity), Steven Cesar (individual capacity), and the Polk County Sheriff's Office (municipal liability via Monell)**

**Legal Basis:**

This Count arises under **42 U.S.C. § 1983** for violation of Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, prohibiting warrantless arrest without probable cause and unlawful seizures of a person.

**Factual Allegations:**

1.      On or about February 11, 2025, Plaintiff Vincent R. Polisi, II, on the day of check-out of the Home2 Suites by Hilton in Polk County, having pre-paid in full for his stay, was notified of repeated unauthorized debit charge attempts before 6AM by Home2 Suites by his debit card issuer. After the 4th unsuccessful attempt due to the card being intentionally locked to prevent such unauthorized transactions, Plaintiff proceeded from the room to the lobby to speak to the front desk. He retained proof of debit card charges, written documentation from the debit card provider support desk confirming the prior pre-paid transactions were authorized by the Home2 Suites under their custodial control and being held in pending status at their direction, that funds were removed from Plaintiff's custodial control and deducted from his account, and a zero balance receipt as proof. Despite this, Defendant James Patterson, General Manager of the Home2 Suites argued that payment was owed. Being a long time Hilton Honors member with more than a

dozen stays in the prior 12 months alone, Plaintiff was intimately familiar with their billing practices and policy and practice of prepayment prior to providing the card key or access to the room, which they had done 4 days prior on February 7th when Plaintiff arrived, and then again on February 8th, when Plaintiff extended the stay.

2.    With the situation unnecessarily escalating and no ability to reason with Patterson who was solely reliant on the computer screen in front of him, Plaintiff, acting in good faith, contacted the Polk County Sheriff's Office (PCSO) and requested a courtesy officer to ensure no further escalation, investigate, and authorize Plaintiff to leave the premises, and voluntarily remained on the scene.

3. Deputy Steven Cesar responded to Plaintiff's voluntary request for law enforcement assistance, arriving at the Home2 Suites in Polk County and initiating an on-scene investigation that lasted more than 30 minutes. During this investigation, Cesar separately interviewed both Plaintiff and hotel employee "Patterson," received and photographed Plaintiff's valid Florida driver's license, tag number, and vehicle, and captured screenshots of Plaintiff's iPhone displaying real-time authorized payments to Hilton's merchant processor, corroborating a zero-balance paid status.

At no point during this on-scene inquiry did Deputy Cesar identify a complainant, neither Plaintiff nor hotel staff alleged a crime. Cesar personally reviewed Plaintiff's proof of payment, conducted separate interviews, and documented the scene, including photographic evidence and direct banking confirmations. His affidavit explicitly acknowledges that he took no enforcement action because no probable cause existed.

Furthermore, even if a billing dispute had been alleged (which it was not), Florida law bars the criminal prosecution of individuals classified as non-transient tenants in extended-stay accommodations.

At the time of the alleged incident—and for several months prior—Plaintiff was lawfully classified as a non-transient residential tenant under Chapter 83, Florida Statutes. This legal designation was not speculative or discretionary, but the direct result of the following court-sanctioned and legally operative events:

•    A standing Exclusive Use and Possession Order issued by the Osceola County Circuit Court in an active marital dissolution proceeding,  enforced by Defendant Judge Shaffer, which forcibly excluded Plaintiff from his prior residence and required him to obtain alternative housing during the pendency of the proceeding;

•    Ongoing litigation in said dissolution proceeding, which materially precluded the establishment of permanent residence due to pending child custody and property division issues still under the jurisdiction of Defendant Judge Shaffer;

•    Plaintiff's continuous residence at extended-stay hotels and short-term rentals, beginning November 2023 and extending through the date of arrest, constituting tenancy by operation of law, as recognized by multiple Florida appellate courts and this very Court in *HSH Eastgate, LLC v. Sheriff of Osceola County*, No. 6:13-cv-1902-Orl-22DAB, 2015 WL 3465795 (M.D. Fla. May 29, 2015).

Accordingly, Plaintiff was not a "guest" under Florida Statutes § 509.141 or § 509.151 at the time of the alleged conduct. He was a residential occupant entitled to the procedural and substantive protections of Florida's landlord-tenant statutes.

Any criminal charge premised on "defrauding an innkeeper" under Florida Statutes § 509.151 was not merely inapplicable—it was legally impossible.

Plaintiff's status as a non-transient residential tenant, protected under Chapter 83, Florida Statutes, had already been established by:

•    A standing Exclusive Use and Possession order issued by the Osceola County Circuit Court,

• Months of continuous occupancy in extended-stay hotels as his primary and only residence,

• Ongoing family court proceedings directly impacting residential status and property access.

Further, Hilton Hotels' own published corporate policy—provided to the State as part of Plaintiff's pretrial disclosures—clearly distinguishes between "guests" and long-term occupants, acknowledging that those who reside in a hotel for extended periods of time, pay rent, and use the location as their primary residence are to be treated as tenants under applicable landlord-tenant law.

Thus:

• There was no complainant, no unpaid balance, and no allegation from Hilton corporate or the local franchisee that any fraud had occurred;

• PCSO deputies had documentary proof of payment in-hand, including a zero-balance receipt and bank transaction verification;

• The arrest and prosecution were premised entirely on a fabricated narrative, contradicted by both law and fact.

The criminalization of a civil billing dispute, in direct violation of Hilton policy, Florida statutory authority, and binding federal precedent, establishes not just

constitutional overreach, but a retaliatory abuse of police power carried out with reckless disregard for the law.

This wasn't law enforcement.

This was retribution costumed in a badge.

The PCSO's post hoc criminal framing of this interaction, after exculpatory evidence was already in its possession, violates not only Florida law, but clearly established federal precedent governing malicious prosecution and abuse of process.

This documented on-scene investigation, which included full cooperation by Plaintiff and the presentation of exculpatory financial evidence, obliterated any future claim of probable cause by any Polk County officer, including Defendant Jimenez, who later initiated arrest by willfully omitting the above facts in a false probable cause affidavit, thus manufacturing a criminal narrative where none existed.

4.    Adding insult to injury, Detective Ariel Jimenez, despite being provided with a zero balance paid receipt from Hilton by Plaintiff, authored and submitted a false probable cause affidavit, misrepresenting the facts, omitting the zero-balance proof, and falsely alleging "Defrauding an Innkeeper", a completely inapplicable statute under which Plaintiff cannot be legally charged or prosecuted

due to his status as a non-transient tenant occupant per Chapter 83 and this Court's own ruling in *HSH Eastgate, LLC v. Sheriff of Osceola County*, No. 6:13-cv-1902-Orl-22DAB, 2015 WL 3465795 (M.D. Fla. May 29, 2015).

Accordingly, Plaintiff was not a "guest" under Florida Statutes § 509.141 or § 509.151 at the time of the alleged conduct. He was a residential occupant entitled to the procedural and substantive protections of Florida's landlord-tenant statutes. Any criminal charge premised on "defrauding an innkeeper" was not merely inapplicable, it was constitutionally and statutorily void. The criminalization of a civil billing dispute between a tenant and an inn-licensed establishment, in direct contradiction to settled law and federal precedent, renders the arrest and prosecution not only baseless, but malicious and retaliatory in nature.

5.     The affidavit lacked any sworn complaint, relied on conclusory and contradictory statements under oath by Patterson in a later recorded interview, and falsely alleged that Plaintiff 'left without paying', a claim conclusively disproven by exculpatory documentation already in PCSO's possession. Moreover, Plaintiff departed the premises only after receiving express permission from Polk County Sheriff's Deputy Steven Cesar following a voluntary interaction initiated by Plaintiff himself. Any assertion that Plaintiff "fled", "fled without paying", "left the

scene without paying", or had any criminal intent to not pay is a legal fiction[13], contradicted by the facts and the very officer who investigated the matter on scene, and the dozen other paid zero balance invoices with Hilton over the prior 12 months preceding the events of February 11, 2025.

6.    Relying on a fabricated affidavit authored by Defendant Ariel Jimenez and co-sponsored by Defendant Steven Cesar, both deputies of the Polk County Sheriff's Office (PCSO), the State obtained an arrest capias on the basis of a purported "Failure to Appear" for a summons that had never been lawfully served.

Here are the undisputed facts:

•    The summons was directed to Plaintiff's former marital residence in Osceola County;

•    Plaintiff had been judicially barred from that property pursuant to a family court Exclusive Use and Possession order issued by the Ninth Judicial Circuit Court actively being enforced by Defendant Judge Shaffer at the time;

•    The Osceola County Sheriff's Office attempted and failed to serve the summons at that address and documented this failure in the official return of service filed with the Polk County Clerk of Court;

---

[13] See **Franks v. Delaware**, 438 U.S. 154 (1978); **Florida v. D.S.**, 685 So. 2d 41 (Fla. 3d DCA 1996); cf. **Devenpeck v. Alford**, 543 U.S. 146 (2004) (arrest must be supported by facts known at the time). See also **Florida Stat. § 812.014** (requiring intent to deprive).

•     Despite that documented failure of service, the Polk County Sheriff's Office, acting on a defective capias void ab initio and signed by Defendant Judge John B. Flynn, initiated a BOLO (Be-On-the-Lookout) across jurisdictions based entirely on a legal fiction: a failure to appear at a hearing for which Plaintiff received no lawful notice, had no legal obligation to attend, and was in fact judicially barred from the address where service was attempted.

This capias was not the result of mistake. It was the culmination of:

•     A knowingly invalid summons issued to an address that the judiciary had already ruled Plaintiff could not lawfully enter;

•     A returned service explicitly marked "unserved" by law enforcement personnel;

•     And a judge, Flynn, who signed the capias despite the clear absence of valid service, violating both procedural due process and long-settled constitutional mandates regarding notice and appearance.

The subsequent BOLO, deployed by PCSO under the authority of Defendant Grady Judd, was executed in reliance on a capias rendered void ab initio due to failure of service. No summons was ever served, no opportunity to appear was granted, and no legal process was ever perfected—making any reliance on that capias legally indefensible. *See Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 84–

85 (1988) (holding that a judgment rendered without proper notice violates due process and is void); *Dusenbery v. United States*, 534 U.S. 161 (2002) (emphasizing notice must be "reasonably calculated" to apprise interested parties).

Critically, Plaintiff had been in direct and **documented** contact with Defendant State Attorney Brian Haas and Florida Attorney General James Uthmeier **prior to the arrest**. Plaintiff:

- Submitted a detailed legal memorandum with **proof of payment**, **zero-balance receipt**, and **real-time bank records**;

- Offered a waiver of civil liability and formal resolution through "The Olive Branch";

- Explicitly warned of federal litigation if the prosecution proceeded on knowingly false grounds.

These communications were not only received and ignored, they were internally circulated, with Defendant Avalon, Haas's own Appellate Director.

Of note, in a subsequent email communication, Plaintiff sent Haas an email using the very same government issued SAO10.com to both Haas and Avalon. Has then forwarded the email to Avalon, who, in a subsequent email responded in writing with the word "Ridiculous," in an accidental "reply to all" to both Haas and Plaintiff, proving receipt, notice, and retaliation in one fell swoop.

At no point did any state actor, including Judd, Haas, Avalon, or Jimenez, request that Plaintiff surrender voluntarily, respond to the exculpatory documents, or attempt any corrective action. Instead, they launched a **multi-jurisdictional BOLO** for a nonviolent 2nd degree misdemeanor, knowing that the capias was defective and the prosecution meritless.

**Bottom line:** Plaintiff did not "fail to appear." He failed to **astrally project** to a hearing he was **never legally noticed of**, in a case built on **no service**, **no jurisdiction**, and **no probable cause**. This was not a clerical error. It was **constitutional entrapment[14]**, cloaked in the false legitimacy of state procedure and deployed to retaliate against protected First Amendment activity.

7.     On May 7, 2025, Plaintiff was arrested by Osceola County deputies while seated at a Starbucks on Osceola–Polk Line Road, based solely on the defective PCSO capias. He was handcuffed, detained, and booked into the Osceola County Jail.

8.     Despite a capias explicitly recommending Release on Recognizance (ROR), Plaintiff was held due to judicial misconduct (detailed in Count IV) and released only after more than 24 hours of unlawful detention.

---

[14] ***Peralta v. Heights Med. Ctr.***, 485 U.S. 80, 84–85 (1988) (failure to provide notice and opportunity to be heard renders judgment void); ***Dusenbery v. United States***, 534 U.S. 161, 167–68 (2002) (notice must be "reasonably calculated" to inform);

9.  On May 13, 2025, Plaintiff was arrested again by PCSO deputies in the middle of a busy Polk County highway (US-27), despite already being in custody and released for the exact same charge days prior. Deputies handcuffed and detained Plaintiff in public based on the still-active BOLO that PCSO and its supervisors failed to cancel.

10.  The on-scene deputy verified the prior arrest only after Plaintiff objected, confirmed Plaintiff had already been in custody, and released him at roadside, but not before the unlawful seizure had occurred.

**Legal Violations:**

Defendants violated Plaintiff's rights by:

- Arresting him without probable cause (4th Amendment);

- Falsifying a probable cause affidavit[15] to support an invalid capias;

- Failing to cancel the BOLO after Plaintiff's first arrest, leading to a second unlawful seizure;

- Acting under the color of state law without justification;

---

[15] Standard operating procedure within Polk County Sheriff's Office under Sheriff Grady Judd of pattern or practice of forged and falsified documents consistent with prior Polk County Sheriff's Office Deputy John Raczynski.

•    Deliberately withholding exculpatory information already in their possession;

•    Engaging in systemic abuse through official PCSO policy and supervision attributable to Defendant Judd.

•    This pattern of selective prosecution is best exemplified by the arrest of former PCSO Deputy John Raczynski on five felony counts, including forgery and tampering with evidence, only for all charges to be dropped via nolle prosequi by Defendant Haas, despite public statements by Defendant Judd glorifying the internal arrest as a badge of institutional integrity

**Municipal Liability (Monell Claim):**

The conduct of Deputies Jimenez and Cesar occurred pursuant to:

•    A custom, policy, or practice of arresting without probable cause in low-level "reputation cases" for media optics;

•    A failure to train or supervise officers in probable cause determinations and post-arrest BOLO procedures;

•    Deliberate indifference by PCSO leadership (Defendant Judd) to the known risk of repeated violations by his subordinates;

• PCSO's prior history of similar misconduct, public rebukes by Florida courts, and its "Grady's Hotel" reputation for punitive policing.

**Resulting Harm:**

As a direct and proximate result of these actions, Plaintiff suffered:

• Loss of liberty and multiple unlawful seizures;

• Public humiliation and reputational damage;

• Emotional distress and psychological harm;

• Disruption of professional and family obligations;

• Financial loss including travel, legal expenses, and lost income;

• Lingering stigma of criminal suspicion despite no lawful basis for charges.

**Relief Requested:**

Plaintiff respectfully demands:

• Compensatory damages against all named Defendants;

• Punitive damages against Defendants Jimenez and Judd in their individual capacities;

- Declaratory judgment that the arrests were unlawful under the Fourth and Fourteenth Amendments;

- Reasonable attorney's fees and costs under 42 U.S.C. § 1988;

- Any further relief the Court deems just and proper.

**COUNT II**

**Malicious Prosecution Under 42 U.S.C. § 1983**

**(Against Defendants JAMES PATTERSON, GRADY JUDD, ARIEL JIMENEZ, STEVEN CESAR, and the POLK COUNTY SHERIFF'S OFFICE)**

13. Since the date of the alleged incident in February 2025, Home2 Suites by Hilton Orlando South Davenport, under the direction of Patterson, a private actor who knowingly provided false sworn testimony to further a retaliatory prosecution, has attempted to debit Plaintiff's CashApp Visa debit card no fewer than twelve (12) times, in a variety of amounts and on at least seven separate dates. These attempts include the exact amount alleged in the probable cause affidavit ($467.76) as well as lesser, arbitrary values such as $200.00 and $150.00.

14. These attempts occurred:

- During ongoing criminal proceedings and post-filing of the criminal charge;

- Without Plaintiff's authorization or consent;

- In complete contradiction to the prosecution's theory of "theft", as these transactions represent civil collection efforts inconsistent with a claim of criminal deprivation.

15.    These repeated manual billing attempts, recorded and timestamped by CashApp, were not routine or automated — they are deliberate acts of consumer billing using retained payment credentials, well after the business allegedly referred the matter for prosecution. This confirms that:

- Home2 Suites knew the amount was still being disputed;

- Home2 Suites viewed the matter as recoverable debt, not theft;

- The prosecution's claim of a "loss" is fictitious;

- And no probable cause existed for criminal charges based on permanent deprivation.

16.    Defendants Judd, Jimenez, Haas, and Avalon had constructive or actual notice of these attempts, as they were referenced in Plaintiff's motions and defense pleadings (before pro se rights were revoked), yet no corrective action was

taken — further bolstering the malicious and retaliatory character of the prosecution.

**Legal Basis:**

This Count arises under the Fourth and Fourteenth Amendments as interpreted through **42 U.S.C. § 1983**. Plaintiff alleges that Defendants initiated and sustained a criminal prosecution against him without probable cause, for retaliatory purposes, and under a knowingly fabricated legal theory—thereby committing malicious prosecution under federal law.

**Factual Basis:**

1. After falsely arresting Plaintiff based on a knowingly invalid affidavit and a capias issued without lawful service or jurisdiction, Defendants Judd, Jimenez, and Cesar advanced and sustained a prosecution they knew lacked factual and legal basis.

2. By the time of arraignment and first appearance, all Defendants had:

• Access to and actual knowledge of exculpatory documentation,

• No named victim or complainant,

- No articulable criminal intent or evidence of deceit by Plaintiff.

3. Despite this, Defendants proceeded to pursue formal prosecution under Florida's "defrauding an innkeeper" statute, even though:

- Plaintiff had paid the hotel in full,

- The transaction was documented with receipts and bank records,

- Plaintiff had already contacted PCSO to resolve the matter voluntarily.

4. Defendants acted with malice and retaliation, targeting Plaintiff for prior litigation activity, public criticism, and protected speech.

5. The prosecution continued despite Plaintiff's compliance with all court directives and despite favorable termination in a parallel criminal matter previously initiated under similar false pretenses (*State v. Polisi*, 2023-MM-2683).

6. Defendants' actions were not isolated but were consistent with PCSO custom and practice, constituting **Monell** liability.

**Constitutional Violations:**

Fourth Amendment: Seizure pursuant to legal process without probable cause.

Fourteenth Amendment: Deprivation of liberty, due process violations, and retaliation under color of law.

**Resulting Harm:**

- Ongoing legal jeopardy and reputational harm.

- Legal expenses, emotional distress, and impaired liberty.

- Continued public humiliation and suppression of protected rights.

**Relief Requested:**

Plaintiff respectfully seeks:

- Compensatory damages;

- Punitive damages against Defendants Judd, Jimenez, and Cesar;

- Declaratory relief stating the prosecution violated Plaintiff's constitutional rights;

- -Attorneys' fees and costs under 42 U.S.C. § 1988;

- All other relief the Court deems just and proper.

**COUNT III**

**Retaliation for Protected Speech Under 42 U.S.C. § 1983**

(Against Defendants GRADY JUDD, RON DESANTIS, JAMES UTHMEIER, ARIEL JIMENEZ, VICTORIA AVALON, BRIAN HAAS, JOHN B. FLYNN, STACIE KAYLOR and COURTNEY DURDEN in their individual capacities)

**Legal Basis:**

This Count arises under **42 U.S.C. § 1983** for violations of Plaintiff's First and Fourteenth Amendment rights. Specifically, Plaintiff was targeted for retaliatory arrest, prosecution, and judicial suppression as a direct consequence of:

• His pre-arrest warnings and whistleblower communications (e.g., The Olive Branch),

• His filing of a federal civil rights lawsuit against high-ranking state actors (*Polisi v. DeSantis, et al.*),

• His protected criticism of law enforcement misconduct,

• His active legal advocacy in state court as a pro se litigant.

These protected activities were met not with lawful engagement, but with weaponized state power designed to chill speech, suppress dissent, and punish Plaintiff for daring to speak out.

**Factual Allegations:**

1.      On May 1, 2025, Plaintiff sent a formal legal memorandum titled The Olive Branch to Florida Attorney General James Uthmeier and State Attorney Brian Haas, identifying misconduct by PCSO deputies and offering a non-litigious resolution with waiver of liability, a constitutionally protected act of petition and redress under the First Amendment.

2.      In that communication, Plaintiff criticized PCSO Deputy Ariel Jimenez by name, documented his own exonerating proof of payment (zero balance receipt, bank records, etc.), and explicitly warned that any continuation of the investigation would result in federal litigation.

3.      Instead of engaging in good-faith review, Defendants doubled down. Six days later, Plaintiff was arrested on a knowingly false capias issued under the supervision of Defendant Judd and based on the affidavit of Defendant Jimenez, the very official criticized in Plaintiff's protected speech.

4.    While Uthmeier[16] did not initiate the prosecution, or actively retaliate as far as Plaintiff is aware at this point, he ratified and allowed it to continue, knowing that the prosecution was in direct response to Plaintiff's protected litigation activity and speech criticizing state officials.

5.    The retaliation continued through the prosecutorial ranks:

•    Defendant Brian Haas, also copied on The Olive Branch communiqué refused to dismiss the charges despite     pre-arrest exculpatory evidence demonstrating they lacked merit.

•    Defendant Victoria Avalon, Haas's head of Appellate and Civil Liability, was personally assigned to prosecute a second-degree misdemeanor, an

_____

[16] **James Uthmeier**, the Attorney General of Florida, was no stranger to the escalating constitutional violations alleged herein. He received direct, written notice from Plaintiff prior to arrest via the "Olive Branch" memorandum, and had already been formally copied on federal litigation involving nearly identical misconduct by law enforcement in the Ninth Judicial Circuit (Osceola County). That earlier case, stemming from unlawful detention by the St. Cloud Police Department, resulted in the dismissal of criminal charges following an emergency Richardson hearing initiated by Plaintiff, pro se.

Despite holding statewide legal oversight authority, Uthmeier took no action—no investigation, no intervention, no referral, and not even the courtesy of a written reply—regarding the subsequent retaliatory conduct in Polk County. While the Attorney General does not directly supervise local prosecutors, his Office's silence, in the face of documented constitutional violations and escalating retaliatory abuse, emboldened a pattern of misconduct and state-enabled harm.

His constitutional and statutory obligations demanded more than passive observation; they required meaningful oversight, good-faith inquiry, or referral to appropriate oversight bodies. By failing to act in the face of repeated and direct notice, the Attorney General crossed the line from nonfeasance to institutional complicity.

Under § 16.52, Fla. Stat., the Department of Legal Affairs is charged with safeguarding "the constitutional integrity of state governments." That mandate cannot be interpreted as authority to ignore the erosion of those very constitutional structures from within. The Attorney General's duty is not limited to resisting federal encroachment—it includes ensuring that Florida's own officers do not become the violators of the very Constitution they are sworn to uphold. When state power is abused under color of law, the constitutional rot is internal—and the obligation to act is at its apex.

appointment so disproportionate that it can only be interpreted as a strategic move to insulate Haas and suppress Plaintiff's litigation by proxy.

• Avalon's written communications confirmed her role in "protecting Haas from liability," which had no connection to criminal justice and every connection to retaliatory suppression of protected conduct.

• Durden participated in court hearings and engaged in fraudulent nolle prosequi with impossible "terms" designed to maintain prosecutorial control over Plaintiff and knowingly mischaracterized ONI (offense not incarcerable) offers in collusion with Judge Stacie Kaylor with  the already memorialized intent (by her supervisor, Avalon) of quashing liability for Haas. This is in addition to prosecuting a case with no complainant, no victim, no theft, no financial loss, no mens rea, and exculpatory evidence including zero balance receipts from Hilton and matching Visa debit card charges.

5.    Judicial retaliation followed:

• Judge Flynn, a former Haas employee and a publicly sanctioned ally of Defendant Judd, denied Plaintiff's dispositive motions without hearing or procedural basis, and sarcastically excused prosecutorial failures on the record ("She forgot").

• Flynn's refusal to withdraw the capias directly enabled Plaintiff's second false arrest, further retaliating against Plaintiff's public filings and legal motions.

• Upon recusal, the matter was handed to Judge Stacie Kaylor — another Haas associate — who invoked a pro se filing ban to silence Plaintiff entirely and obstruct access to the court.

9.    In further retaliation for Plaintiff's protected litigation activities and civil rights advocacy, Defendants continued to prosecute Plaintiff while ignoring clear evidence of ongoing unlawful conduct by the supposed "victim." Specifically, between February and July 2025, Home2 Suites made dozens of unauthorized charge attempts against Plaintiff's debit card — even after the matter was criminally charged, suggesting a coordinated suppression of civil billing fraud by the merchant.

10.    These attempts were known to state actors, reported in filings by Plaintiff **BEFORE THE PRO SE FILING BAN**, and reflective of a willful refusal to dismiss a meritless case. The prosecutorial team's failure to investigate or disclose the complainant's contemporaneous credit card fraud further evidences a retaliatory and vindictive motivation in advancing the prosecution.

**Supervisory Liability of Governor Ron DeSantis for Repeated Deliberate Indifference to Documented Police Misconduct and Retaliatory Prosecution**

Plaintiff provided Governor Ron DeSantis with two distinct, formal notifications of unconstitutional conduct by subordinate state actors under his executive authority:

1.      First notice – June 2024, via certified U.S. mail and tracked USPS correspondence, following Plaintiff's false arrest and 9-day unlawful detention in *State v. Polisi*, Case No. 2023-MM-2683 (Osceola Cty. Ct.), in which criminal charges were dismissed after an Emergency Richardson Hearing initiated by Plaintiff exposed a Brady violation and destruction of exculpatory evidence by the St. Cloud Police Department.

That misconduct and Governor DeSantis's deliberate indifference despite multiple notifications of ongoing post hoc retaliation by the St. Cloud Police Department formed the basis for *Polisi v. DeSantis et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla.), in which DeSantis was a named Defendant.

2.      Second notice – May 1, 2025, via written memorandum entitled "The Olive Branch," sent by email to Attorney General James Uthmeier and copied to State Attorney Brian Haas, detailing ongoing retaliatory conduct by the Polk County Sheriff's Office, specifically fabricated charges initiated by Deputies Jimenez and Cesar under the command of Sheriff Grady Judd.

Despite actual and repeated notice of documented unconstitutional conduct, Governor DeSantis took no investigative, disciplinary, or remedial action in response to either event. He:

• Failed to investigate or suspend Sheriff Grady Judd under Article IV, Section 7(c) of the Florida Constitution, despite possessing explicit statutory authority;

•    Appointed or maintained judges with direct personal and professional ties to State Attorney Brian Haas, including Attorney John Waters, who was promoted to the bench as Judge John Waters after serving as defense counsel for former Polk County Sheriff's Deputy John Raczynski[17], a deputy publicly outed by Sheriff Grady Judd in a press conference for forgery, evidence tampering, and official misconduct.

In that case, Sheriff Judd used his trademark media blitz tactics to trumpet PCSO's commitment to "self-policing" and "internal accountability," yet his department coordinated with Haas to secure a nolle prosequi on all five felony counts against Raczynski and his co-defendants — despite overwhelming internal documentation of criminal misconduct.

---

[17] The case involving Deputy John Raczynski was not obscure. It was paraded on television by Sheriff Grady Judd himself — complete with mugshots, media statements, and the appearance of transparency. Yet the legal outcome — *a complete walk* — was secured not by a jury, but through quiet prosecutorial discretion exercised by Defendant Haas and his then-counterpart John Waters. That same John Waters now occupies a judicial bench in Polk County. **This isn't reform. It's quid pro quo insulation.**

➤ This act of selective prosecution and mutual protection between Haas and Waters was not punished. It was rewarded. Waters was elevated to judicial office after facilitating a sweetheart deal for a disgraced law enforcement officer.

This pattern illustrates:

• A closed-loop network of prosecutorial and judicial actors rewarding internal loyalty over constitutional accountability;

• The Governor's deliberate tolerance and ratification of a system where political loyalty and damage control trump equal protection under law.

Under the supervisory liability doctrine articulated in *Keating v. Miami*, No. 03-10072-CIV-MARTINEZ (S.D. Fla. 2006), *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), and *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), such deliberate indifference to known misconduct, especially when followed by elevation of those responsible, constitutes actionable ratification under 42 U.S.C. § 1983.

DeSantis's refusal to intervene, discipline, or halt these retaliatory appointments, despite actual knowledge of prior federal litigation and specific misconduct events, satisfies the pleading threshold for supervisory liability under Twombly/Iqbal and Eleventh Circuit precedent.

Additionally, Defendant DeSantis further:

• Allowed systemic retaliation and denial of court access to continue against a known whistleblower and civil rights litigant;

• Took no action following the public exposure of due process violations, pro se bans, and retaliatory arrests across two jurisdictions.

Under established Eleventh Circuit precedent, such inaction constitutes deliberate indifference and ratification of ongoing constitutional violations, and gives rise to supervisory liability under 42 U.S.C. § 1983. *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990).

A supervisor who has "actual or constructive notice" of constitutional abuse and chooses inaction becomes personally liable for the foreseeable harms that follow. See also *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1050–51 (11th Cir. 2014).

**COUNT IV**

**Supervisory Liability for Retaliation, Deliberate Indifference, Ratification and Constitutional Violations under 42 U.S.C. § 1983**

(Against Defendants Grady Judd, Ron DeSantis, and James Uthmeier, in their individual capacities)

**Legal Basis:** This Count arises under 42 U.S.C. § 1983 and asserts that Defendants Judd, DeSantis, and Uthmeier, acting under color of state law, are liable in their individual capacities for ongoing deprivations of Plaintiff's constitutional rights stemming from a pattern of deliberate indifference, retaliatory animus, and ratification of unconstitutional conduct. Supervisory liability attaches where government officials have actual or constructive notice of subordinate misconduct and fail to act. *See Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003); *Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999).

**Factual Allegations:**

Despite formal written notice of misconduct, each Defendant allowed, encouraged, or failed to prevent escalating violations of constitutional rights targeting Plaintiff for whistleblowing, litigation, and public criticism of governmental abuse.

Clear evidence exists of a system shielding law enforcement insiders from prosecution, including the elevation of John Waters, the defense attorney who "negotiated" a legally miraculous dropped five-felony case for PCSO deputy (John Raczynski) brought by Defendant Sheriff Grady Judd himself, to judicial office by Governor DeSantis, no investigation, oversight, or reform followed, reinforcing a pattern of deliberate indifference and loyalty-based judicial appointments.

As but one example of pattern or practice, on or about Mar 22, 2021, Sheriff Grady

Judd, in his supervisory capacity, held a widely publicized press conference announcing the arrests of Deputy John Raczynski and two other Polk County Sheriff's Office deputies for serious felonies, including forgery, evidence tampering, official misconduct, and criminal use of personal information. Judd, in typical theatrical fashion, praised his department's "integrity" for self-reporting the crimes, touting the arrests as evidence of internal accountability. However, shortly thereafter, Defendant State Attorney Brian Haas dropped all five felony charges via nolle prosequi, effectively shielding Raczynski from prosecution and Judd and the internal policies of the Polk County Sheriff's Office from further investigation related to training, supervision, etc. The attorney representing Raczynski in those negotiations? John Waters, now Judge John Waters, who was then subsequently appointed to the bench by Defendant Governor Ron DeSantis as a quid pro quo for supporting his "Back The Blue" campaign placing law enforcement above citizens' rights. This sequence of events which include prosecutorial leniency, judicial promotion, and gubernatorial appointment, was never investigated or explained, despite formal notice and escalating constitutional violations across multiple circuits.

See: Polk County Sheriff's Office Press Conference, March 22, 2021;

Public Records in State v. Raczynski, Case #: 53-2021-CF-002164-A000-XX

Polk Cty. County Court, Judge: Mark Carpanini , Division: F2

State Attorney: Assistant State Attorney for Brian Haas: Josephine Colon.

12/21/2020  918.13(1B)  CONSPIRACY  TAMPER/FABRICATE  W  PHYSICAL

EVIDENCE

12/21/2020 918.13(1B) ATTEMPT TAMPER/FABRICATE W PHYSICAL
EVIDENCE

03/18/2021 831.02 UTTER FORGED INSTRUMENT

03/18/2021 838.022(1A) PUBLIC SERVANT FALSIFY OFFICIAL DOCUMENT

03/16/2021 831.01 FORGERY

*Disposition All Charges:*
*Adjudication Withheld 04/02/2024*
*Nolle Prosequi 04/02/2024*
*Dropped/Abandoned (NoBill) 05/21/2021*

https://www.polksheriff.org/news-investigations/2021/03/22/three-deputies-arrested-during-investigation-into-evidence-tampering

Video of Press Conference as televised by ABC Action News:
https://youtu.be/RzJ4GoXk6qw?si=ZcdHzutiOSims6oz

**Legal Violations:**

Each named Defendant (Judd, DeSantis, Uthmeier), acting under color of state law,

violated Plaintiff's clearly established constitutional rights by:

• Retaliating against Plaintiff for engaging in protected First

Amendment activity;

• Using state authority and criminal process to punish speech critical of

government actors;

- Acting in concert to suppress legal challenges, litigation, and filings brought by Plaintiff;

- Ratifying or failing to prevent the use of state power to suppress litigation and whistleblowing;

- Allowing the use of false affidavits, void process, and forum closure to silence criticism and avoid exposure;

- Targeting Plaintiff for prosecution not based on evidence or public safety, but to neutralize exposure to civil liability.

- Demonstrating deliberate indifference to obvious violations of liberty and due process.

**Resulting Harm:**

As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered:

- Unlawful arrest and detention without probable cause;

- Loss of liberty through false arrest and detention;

- Emotional distress, reputational damage, and psychological trauma;

- Retaliatory suppression of court access and interference with pro se rights and active legal proceedings;

- Emotional distress, reputational damage, and professional hardship;

- Compounding judicial and prosecutorial abuse in violation of constitutional norms.

- Continued exposure to unconstitutional process with no legitimate public safety justification.

**Relief Requested:**

Plaintiff respectfully demands:

- Declaratory judgment that the conduct described above constituted unconstitutional retaliation for protected speech;

- Compensatory damages against Judd, DeSantis, and Uthmeier for constitutional injury;

- Punitive damages against individual Judd, DeSantis, and Uthmeier for willful and malicious misconduct;

- Attorneys' fees and costs under 42 U.S.C. § 1988;

• All other relief this Court deems just and appropriate.

**COUNT V: Denial of Procedural Due Process and Judicial Misconduct (42 U.S.C. § 1983 – First, Fifth & Fourteenth Amendments)**

(Against Defendants: Judge Laura Shaffer, Judge Flynn, Judge Kaylor in their individual capacities, for non-judicial and retaliatory acts not protected by absolute judicial immunity, and Ron DeSantis for Supervisory Liability under §1983 (deliberate indifference + ratification))

**Legal Basis:**

This Count arises under **42 U.S.C. § 1983**, asserting claims for:

• Unlawful retaliation under the First Amendment's Petition Clause (filing lawsuits),

• Deprivation of liberty and access to courts under the Fifth and Fourteenth Amendments,

• Violation of fair tribunal requirements, under clearly established federal law, including Caperton and Murchison.

This Count arises under **42 U.S.C. § 1983**, asserting a cause of action for for unlawful retaliation under the First Amendment's Petition Clause (U.S. Const. amend. I), which protects the right to file lawsuits against the government and its

89

officials, under the First Amendment for deprivation of liberty without due process, and under the Fourteenth Amendment, based on retaliatory judicial conduct undertaken by Defendant Judge Laura Shaffer, who acted under color of law while personally named in a pending federal civil rights lawsuit. see *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (filing lawsuits is protected speech under the Petition Clause) *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

**Factual Allegations:**

1.    On February 17, 2025, Plaintiff Vincent R. Polisi, II filed a federal civil rights action naming Judge Laura Shaffer as a defendant for constitutional violations stemming from family court proceedings. (*See: Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP, M.D. Fla.)

2.    On May 7, 2025, Judge Shaffer presided over Plaintiff's final divorce trial, in which she:

- Revoked Plaintiff's pro se status,

- Struck over 13 months of court filings,

- Denied Plaintiff equitable distribution of marital property,

- Stripped Plaintiff of parental rights without evidentiary basis,

- Created procedural barriers to appeal by vacating the record.

3. Less than 24 hours later, on May 8, 2025, following Plaintiff's arrest on a Polk County warrant, he appeared in first appearance proceedings while in custody at Osceola County Jail.

4. The presiding judge at first appearance was again Judge Laura Shaffer, now acting in a criminal capacity for an arrest that originated from another judicial circuit — specifically the Tenth Judicial Circuit (Polk County), which had designated the warrant as "Release on Own Recognizance (ROR)" with zero bond.

5. Despite that ROR designation and over the on-record objection of the assigned public defender, Judge Shaffer:

• Acted ultra vires, outside her jurisdiction, by overriding a sister circuit's lawful release order with no factual basis or lawful authority to do so, violating Plaintiff's substantive and procedural due process.

• Denied Plaintiff's release,

• Ordered extradition to Polk County,

• Offered no factual justification or changed circumstances to override the originating court's designation,

•    Made no disclosure of her status as a named defendant in Plaintiff's federal suit, despite a constitutional obligation to recuse under clearly established federal and Florida law.

6.    Approximately 12 hours later, with no explanation, Plaintiff was released from custody without extradition, raising further suspicion that Shaffer's actions were improper, retaliatory, and legally unsustainable.

7. Plaintiff's arrest had already been documented by state officials; he posed no flight risk, had no bond, and had fully cooperated with law enforcement. Unlike a typical first appearance detainee, Plaintiff was not a stranger to the bench — Judge Shaffer had over 13 months of direct judicial oversight in Plaintiff's parallel family law matter. She possessed intimate knowledge of Plaintiff's residence, financial condition, marital status, parental rights, and procedural conduct, giving her a uniquely informed position not merely as a judicial officer, but as a defendant in a pending §1983 action filed by the very same litigant.

This level of preexisting familiarity elevated her obligation to recuse under both Florida judicial ethics rules and federal due process standards. Instead, she presided over Plaintiff's first appearance, denied release in direct contradiction of the originating court's ROR designation, and ordered extradition — despite having no new facts, no legitimate justification, and a personal conflict that would have

disqualified any reasonable jurist from participating. This failure to disqualify herself under these circumstances violated the constitutional requirement of a fair tribunal as articulated in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), where even the appearance of bias stemming from personal entanglement mandates recusal.

8.     The timing, conflict of interest, and procedural override of another circuit's designation created the clear appearance of retaliatory conduct in violation of Plaintiff's First Amendment right to petition the government and Fourteenth Amendment right to due process and liberty.

9.     The retaliatory nature of this action is further magnified by Shaffer's direct involvement in both Plaintiff's civil family law loss and criminal judicial determination — within 24 hours, involving the same individual, and in response to protected federal litigation. See *Dean v. Shirer*, 547 F.2d 227, 231 (4th Cir. 1976) ("A judge is not immune for actions taken in the clear absence of all jurisdiction.") and, *Stump, supra* ("judicial acts only immune if taken within jurisdiction and not in absence of all authority").

**Legal Violations:**

Defendant **LAURA SHAFFER**, acting under color of law and in a capacity not shielded by judicial immunity (due to conflict and retaliatory motive), violated Plaintiff's:

•    First Amendment right to be free from retaliation for filing a federal civil rights lawsuit;

•    Fourteenth Amendment right to liberty and due process, by unlawfully denying ROR against another court's directive;

•    Right to fair tribunal, as established under *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), and *In re Murchison*, 349 U.S. 133 (1955).

Under *Caperton*, a judge's failure to recuse where there is a serious risk of actual bias based on prior personal entanglement with a litigant violates due process, regardless of whether the judge believes themselves impartial.

Under *In re Murchison*: A fair trial in a fair tribunal is a basic requirement of due process. "No man is permitted to try cases where he has an interest in the outcome." Defendant Shaffer is complicit in this both in Plaintiff's marriage dissolution trial of the prior day and in the first appearance hearing while in

custody.

**Resulting Harm:**

As a direct and proximate result of Judge Shaffer's retaliatory and unconstitutional conduct, Plaintiff suffered:

•    Continued incarceration despite eligibility for immediate release under the original ROR designation;

•    Emotional distress, reputational harm, and psychological trauma, compounded by the arbitrary revocation of liberty and judicial overreach;

•    Loss of income and economic disruption, including the inability to work, earn revenue, attend business appointments, or conduct professional obligations during the wrongful incarceration;

•    Impairment of his ability to prepare a defense, respond to legal deadlines, and access courts: both criminal and civil;

•    Loss of opportunity to appear in post-divorce family court proceedings, further compounding injury to Plaintiff's parental rights and custodial status;

- Diminished standing in ongoing litigation due to reputational and procedural disadvantage intentionally inflicted under color of law.

**Relief Requested:**

Plaintiff demands the following relief against Defendant JUDGE LAURA SHAFFER (Plaintiff seeks monetary relief only in Defendant Shaffer's individual capacity, for acts taken outside the judicial role and in violation of clearly established law):

- Declaratory judgment that her conduct violated Plaintiff's constitutional rights;

- Compensatory damages for unlawful detention, retaliation, and resulting harm;

- Punitive damages for willful retaliation and abuse of judicial authority;

- An order referring the matter to the Florida Judicial Qualifications Commission and/or the DOJ Civil Rights Division for further inquiry;

- Costs, interest, and attorney-equivalent fees under 42 U.S.C. § 1988;

- All further relief this Court deems just and proper.

**COUNT VI: Conspiracy to Retaliate Against Protected Speech and Obstruct Court Access (42 U.S.C. § 1985(3) – First and Fourteenth Amendments)** (Against Defendants: Judd, Flynn, Kaylor, Shaffer, Haas, Avalon, Durden, – all in individual capacities)

**Defendants[18]:**

- Judge Laura Shaffer – Individual capacity

- Judge John B. Flynn – Individual capacity

- Judge Stacie Kaylor – Individual capacity

- Brian Haas – Individual capacity

- Victoria Avalon – Individual capacity

- Courtney Durden – Individual capacity

- Grady Judd – Individual capacity

**Legal Basis:**

To plead a claim under § 1985(3), Plaintiff must allege:

---

[18] The Supreme Court has long warned against conspiracies by state actors to silence criticism or suppress litigation. Where judges, prosecutors, and law enforcement act in concert to punish protected speech, judicial immunity cannot cloak retaliatory intent. Judicial immunity does not apply where judges act outside their judicial capacity or in the clear absence of jurisdiction. See *Mireles v. Waco*, 502 U.S. 9 (1991); *Forrester v. White*, 484 U.S. 219 (1988). Retaliatory acts by a named defendant in a pending lawsuit fall outside judicial immunity and violate clearly established law under *Caperton v. A.T. Massey*, 556 U.S. 868 (2009).

(1) a conspiracy;

(2) to deprive a person of the equal protection of the laws;

(3) an act in furtherance of the conspiracy;

(4) which causes injury to person or property, or the deprivation of any right or privilege. *See Denno v. School Bd. of Volusia Cnty.*, 218 F.3d 1267, 1273 (11th Cir. 2000).

This Count is brought under 42 U.S.C. § 1985(3), which prohibits conspiracies formed with the intent to deprive a person of the equal protection of the laws or of equal privileges and immunities. *See Griffin v. Breckenridge, 403 U.S. 88 (1971).* Further it asserts a conspiracy among state actors to retaliate against Plaintiff for protected speech and litigation, and to obstruct access to the courts in violation of the First and Fourteenth Amendments. The Defendants engaged in coordinated actions intended to suppress Plaintiff's lawsuits, silence his filings, and inflict punitive criminal process in retaliation for whistleblower activity and civil rights litigation. Each Defendant knowingly participated in overt acts in furtherance of this unlawful agreement, resulting in deprivation of Plaintiff's constitutional rights and liberty.

**Factual Allegations:**

1.      On February 17, 2025, Plaintiff filed a §1983 civil rights lawsuit in federal court: *Polisi v. DeSantis et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla.), naming, among others, Governor Ron DeSantis and Judge Laura Shaffer as defendants.

2.      This lawsuit challenged, among other things, Judge Shaffer's pattern of due process deprivations during Plaintiff's family court litigation, including:

•      Termination of pro se status;

•      Striking 13 months of filings to prevent appeal;

•      Denial of custody and property without evidentiary basis.

3.      On May 7, 2025, Plaintiff was arrested on a warrant issued by Polk County. Despite the capias carrying an ROR designation, at his first appearance, Judge Shaffer, now a named federal defendant, presided.

4.      Despite:

•      The ROR designation from the originating 10th Judicial Circuit;

•      No objectionable conduct or flight risk;

•      No new evidence;

- And a formal objection by the public defender on the record, Judge Shaffer reversed the ROR and ordered extradition, in direct contradiction of the originating court's intent, with no stated justification.

5. At the time, Judge Shaffer had full personal knowledge of Plaintiff:

- As a litigant of 13 months in her courtroom;

- As a named adversary in a pending §1983 suit filed against her less than 90 days earlier.

6. The timing, context, and deviation from the ROR directive form a clear causal chain of retaliatory judicial conduct under color of law.

7. Judge Shaffer's decision directly extended Plaintiff's deprivation of liberty, obstructed his ability to appear in post-divorce civil matters, and served no judicial purpose other than punishment.

8. Upon reassignment to Judge John B. Flynn, Plaintiff faced a continuation of retaliation:

- Flynn presided over proceedings despite being the author of the defective capias.

- Flynn summarily denied Plaintiff's motions without hearing, despite lack of traverse from the State, and over Plaintiff's legal objection under Rule 3.190(c)(4).

- When challenged on the State's noncompliance, Flynn stated "She forgot," referring to the prosecutor, Defendant and Director of Appellate and Civil Liability for State Attorney Brian Haas, Victoria Avalon,    an admission of procedural indifference captured on video and transcript.

9.    Plaintiff filed a Verified Motion to Disqualify based on Flynn's documented bias in favor of Defendant Judd; bias that earned Flynn a public suspension by the Florida Supreme Court on November 27, 2024, for campaign statements glorifying incarceration at "Grady's Hotel."

10.    **Flynn's Disqualification and Strategic Exit**

Flynn did not formally rule on Plaintiff's Verified Motion to Disqualify. Instead, he recused, but only after summarily denying Plaintiff's dispositive motions in open court without adversarial hearing, over Plaintiff's on-record legal objections citing Rule 3.190(c)(4), and after permitting the State to sidestep mandatory traverses by simply stating on the record, "She forgot."

This "recusal by retreat" occurred only after Plaintiff publicly exposed:

- Flynn's Florida Supreme Court discipline for overt bias in favor of Defendant Sheriff Grady Judd;

- His former employment as a prosecutor under Defendant Brian Haas;

- His personal role in signing the defective capias that led to two unlawful arrests.

Flynn's decision to recuse, without addressing the verified allegations, was not a good-faith act of judicial neutrality, but a tactical withdrawal to avoid the professional and legal exposure detailed in Plaintiff's motion. This abrupt exit occurred only after he inflicted procedural harm, denied meritorious motions, and compounded Plaintiff's constitutional injuries.

11.    Flynn's departure did not mark the end of retaliatory obstruction. Upon reassignment to Judge Stacie Kaylor, a former subordinate of Defendant Haas, Plaintiff faced further suppression:

**Kaylor's Preemptive Forum Closure to Avoid Disqualification**

Before Plaintiff ever appeared before her, and in what can only be described as a deliberate and preemptive maneuver to shield herself from judicial scrutiny and avoid the filing of a Verified Motion to Disqualify, Judge Stacie Kaylor invoked an unlawful "pro se filing ban" that barred Plaintiff from submitting any documents to the clerk of court,  effectively closing the courtroom and silencing his legal voice.

• This judicial blockade occurred without findings of frivolity, without notice, and without hearing, in violation of Plaintiff's due process rights and long-settled federal law recognizing the right of access to the courts.

• The result was not judicial economy. It was procedural strangulation, a calculated act of forum closure to suppress filings that directly implicated Judge Kaylor, her prosecutorial ties to Defendant Haas, and the ongoing constitutional violations documented in Plaintiff's prior filings and pending federal action.

•       Plaintiff's demand for jury trial was ignored. Kaylor attempted to force a bench trial under a mischaracterization of the charge as non-incarcerable, while knowing a conviction would trigger probation revocation and incarceration in another jurisdiction.

12.    These retaliatory actions were carried out in tandem with prosecutors:

•       State Attorney Brian Haas, having received Plaintiff's "Olive Branch" memorandum pre-arrest, refused to intervene despite knowledge of exculpatory evidence.

**Avalon's Insertion and the "Liability Firewall" Strategy**

• Defendant Victoria Avalon, Director of Appellate and Civil Liability for the Office of the State Attorney under Brian Haas, was personally injected into

Plaintiff's prosecution, a second-degree misdemeanor case, not for reasons of legal necessity, but as part of a strategic internal response to Plaintiff's prior federal lawsuit in Osceola County, and the pre-arrest Olive Branch communications now implicating Haas, his office, Attorney General James Uthmeier, Governor Ron DeSantis, and Defendant Sheriff Grady Judd.

• This move was not speculative. It was confirmed in writing, via direct email to Plaintiff, in which Avalon expressly stated that her role was to "protect Mr. Haas from liability."

• The appointment of Avalon, the most senior civil liability officer in the office, into a dual-role position, to personally prosecute a low-level misdemeanor is a tactical anomaly, one that strongly evidences known exposure to constitutional liability and anticipated § 1983 litigation.

• Her conduct, position, and communications establish that Defendant Haas was not merely aware of the violations. Rather, he mobilized his institutional firepower to insulate himself from the consequences, using the very apparatus of the State to retaliate against Plaintiff and obstruct redress.

• Courtney Durden, also assigned to the criminal case, continued to advance prosecution despite being on actual notice of Plaintiff's federal suit, pending writs, and exculpatory evidence.

13.     At all relevant times, Defendant Grady Judd, as the final policymaker for PCSO, was aware that:

•       Plaintiff had criticized him directly in "The Olive Branch," using protected First Amendment speech;

•       The capias issued against Plaintiff lacked probable cause;

•       Two arrests had occurred despite prior release;

•       Defendant Judd's deputies were not neutral enforcers of the law. They were the initiating actors in a retaliatory criminal proceeding that lacked any legitimate basis in fact, law, or probable cause. Rather than investigate with objectivity, they targeted Plaintiff — the very individual who voluntarily contacted the Polk County Sheriff's Office to report and resolve the matter — and manufactured criminal allegations against him in direct retaliation for his cooperation and protected speech.

**Coordinated Retaliatory Agreement Among State Actors**

Each Defendant knowingly engaged in coordinated acts intended to further a shared unlawful objective: to suppress, retaliate against, and obstruct Plaintiff's litigation and speech. This agreement is evidenced by:

- Avalon's written admission that she was "protecting Mr. Haas from liability,"

- Kaylor's preemptive pro se ban to avoid disqualification, ONI mischaracterization to deceive Plaintiff into incarceration via probation violation,

- Flynn's procedural misconduct in favor of Judd,

- Haas's refusal to dismiss charges despite pre-arrest proof of falsity,

- Shaffer's override of ROR while a named federal defendant, and

- The delegation of PCSO resources to carry out repeated retaliatory arrests.

These acts, when viewed together, constitute a deliberate and unconstitutional plan under § 1985(3), not isolated misconduct.

**Legal Violations:**

All named Defendants, under color of law, violated clearly established federal rights by:

- Engaging in retaliatory arrest, prosecution, and judicial conduct for protected speech and litigation;

- Suppressing access to courts through forum closure and manipulation of procedural rights;

- Enacting procedural irregularities solely to punish Plaintiff's prior federal filings and whistleblower communications;

- Using the machinery of state to inflict harm for the exercise of lawful rights.

- The acts described herein were not judicial decisions made within jurisdiction, but coordinated extrajudicial conduct driven by retaliation, bias, and a shared objective to punish constitutionally protected activity. As such, they fall outside the shield of absolute judicial immunity and are actionable under federal law. *See:* Forrester v. White, 484 U.S. 219 (1988)

**Resulting Harm:**

As a direct and proximate result, Plaintiff suffered:

- Retaliatory detention and denial of bond;

- Obstruction of First Amendment rights and judicial access;

- Emotional distress and reputational harm;

• Legal injury through loss of court access, jury trial denial, and pro se suppression;

• Ongoing threat of unlawful conviction via structurally biased proceedings;

• Economic loss from prolonged litigation and civil opportunity cost.

**Relief Requested:**

Plaintiff demands:

• Compensatory damages against all named Defendants;

• Punitive damages against Defendants Shaffer, Flynn, Kaylor, Haas, Avalon, Durden, and Judd in their individual capacities;

• Declaratory judgment that Defendants' acts constitute First and Fourteenth Amendment violations;

• Permanent injunctive relief barring further retaliation or judicial forum closure;

• Costs and attorneys' fees under 42 U.S.C. § 1988;

• Any further relief the Court deems just and equitable.

## COUNT VII

## Retaliation for Protected Speech Under 42 U.S.C. § 1983

(Against Defendants GRADY JUDD, RON DESANTIS, JAMES UTHMEIER, ARIEL JIMENEZ, VICTORIA AVALON, BRIAN HAAS, JOHN B. FLYNN, AND STACIE KAYLOR in their individual capacities)

## Legal Basis:

This cause of action is brought pursuant to **42 U.S.C. § 1983** for violations of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution. Each named Defendant acted under color of state law to retaliate against Plaintiff's constitutionally protected speech, including his filing of a federal civil rights lawsuit, formal written complaints to government officials, and legal advocacy as a pro se litigant in state court. These retaliatory actions include initiating and advancing a knowingly baseless criminal prosecution, facilitating false arrest, obstructing court access, and leveraging judicial authority to suppress dissent and chill further protected activity.

## Factual Allegations:

1. On May 1, 2025, Plaintiff sent a detailed pre-arrest memorandum entitled The Olive Branch to Florida Attorney General James Uthmeier (to provide to Defendant DeSantis as, since shortly after his inauguration on February 17,

2025, Uthmeier was, and had been the point of contact for conferral and US Marshal Service for Governor DeSantis in Polisi v. DeSantis, et al. Case No. 6:25-cv-00256-WWB-LHP, filed February 17, 2025) and State Attorney Brian Haas, documenting misconduct by Deputy Ariel Jimenez and the Polk County Sheriff's Office. This memorandum included:

- Evidence of full payment for the hotel stay;

- Screenshots of matching bank transactions;

- A waiver of liability offer to de-escalate potential litigation;

- Protected criticism of public officials, including Sheriff Grady Judd.

2.    The memorandum specifically identified Jimenez by name, described the falsity of the criminal charge, and warned of imminent federal litigation under **42 U.S.C. § 1983** if the prosecution continued.

3.    On February 17, 2025, Plaintiff had already filed a federal civil rights lawsuit, *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256 (M.D. Fla.), naming judicial, prosecutorial, and executive officers involved in an earlier unlawful arrest and detention.

4.      Within six days of The Olive Branch, and despite actual notice of Plaintiff's protected activity, Defendants initiated and advanced a retaliatory arrest and prosecution:

•      Jimenez, in direct response to being named in the memorandum, authored a knowingly false probable cause affidavit to obtain a capias, omitting exculpatory evidence and fabricating the elements of the charge;

•      Judd, as Sheriff and final policymaker, ratified the continued issuance of a BOLO and warrant based on a "failure to appear" for a summons that was never served—a void process from inception;

•      Haas, despite actual written notice and access to exonerating documents, refused to review or dismiss the case and instead permitted it to proceed in retaliation for Plaintiff's public criticism and federal complaint;

•      Avalon, Director of Appellate and Civil Liability for the State Attorney's Office, was personally reassigned to prosecute Plaintiff's second-degree misdemeanor—a move so atypical it signals non-prosecutorial motives. Avalon's written communications, sent directly to Plaintiff, referenced efforts to "protect Haas from liability," thereby confirming the retaliatory purpose of her involvement.

5.      Flynn, a former employee of Haas and judicial officer sanctioned by the Florida Supreme Court for bias toward Sheriff Judd, advanced the prosecution by:

•      Summarily denying Plaintiff's dispositive motions without adversarial hearing;

•      Excusing the State's failure to file a traverse on no less than five dispositive motions, stating on the record: "She forgot";

•      Failing to withdraw the capias post-arrest, directly resulting in Plaintiff's second false arrest on May 13, 2025;

•      Refusing to recuse until Plaintiff filed a Verified Motion to Disqualify, despite knowledge of his own disqualifying connections and record of judicial bias.

6.      Judicial retaliation continued with Judge Stacie Kaylor, who:

•      Assumed jurisdiction immediately following Flynn's recusal due to documented bias;

•      Issued a unilateral "pro se filing ban", absent any finding of frivolity or judicial justification, solely in response to Plaintiff's court filings and motion practice;

- Used that order to block Plaintiff from defending himself in a pending criminal action — effectively silencing his access to the court and obstructing his Sixth Amendment right to defend himself;

- Preemptively struck against any potential Plaintiff's Verified Motion to Disqualify her, instead invoking the filing ban to avoid its filing or judicial obligation of ruling on it.

Before Plaintiff ever appeared before her, Defendant Judge Stacie Kaylor imposed a "pro se filing ban" — a judicial order that unilaterally cut off Plaintiff's access to the clerk of court and barred the filing of any documents. This action was taken without a prior hearing, without findings of frivolousness, and without Plaintiff ever having committed any sanctionable abuse of process under the Florida Rules of Judicial Administration.

9.    The filing ban was not the result of misbehavior, courtroom disruption, or dilatory tactics. It was a preemptive act of retaliation, designed to:

- Prevent Plaintiff from filing a Verified Motion to Disqualify similar to the one that forced the recusal of her predecessor, Judge John B. Flynn;

- Shield the prosecution team from exposure to further constitutional scrutiny;

- Maintain Defendant Haas's control over the case through a former employee acting under his direct influence;

- Close the forum to a pro se litigant actively engaged in protected legal petitioning.

10.     Compounding this retaliation, Judge Kaylor misclassified the charge as "Offense Not Incarcerable" (ONI) to justify denial of Plaintiff's Sixth Amendment right to a jury trial, despite knowing that any conviction would trigger incarceration via probation revocation in another jurisdiction.

11.     These actions, the premature filing ban and strategic misclassification, cannot be divorced from Plaintiff's litigation history, including:

- His federal lawsuit against multiple state actors;

- His scorched-earth pretrial filings documenting misconduct;

- His public exposure of the unconstitutional actions taken by both prosecutors and judges connected to the same State Attorney's Office.

**LEGAL IMPACT:**

Kaylor's conduct goes beyond mere error — it's structural retaliation, disguised as "court management." Denying access to the court before Plaintiff ever appeared before her? That's not judicial economy. That's legal arson with a robe on.

These actions by Judge Kaylor, executed under color of law but outside any legitimate judicial function, constitute ongoing First and Fourteenth Amendment retaliation, by:

- Shutting down Plaintiff's access to court,

- Suppressing further criticism and filings,

- Obstructing redress of grievances in direct response to Plaintiff's protected speech.

These retaliatory acts occurred in direct response to Plaintiff's speech, litigation, and legal advocacy, and would chill a person of ordinary firmness from continuing to exercise First Amendment rights.

**Constitutional Violations:**

Each Defendant's conduct constitutes retaliation for protected speech and litigation activity in violation of:

- The First Amendment, by targeting Plaintiff for criticizing public officials and engaging in petitioning activity;

- The Fourteenth Amendment, by subjecting Plaintiff to unequal treatment, arbitrary prosecution, and state-sponsored retribution.

**Resulting Harm:**

As a direct and proximate result of the above-described constitutional violations, Plaintiff suffered:

•        Unlawful arrest and loss of liberty;

•        Emotional distress, public embarrassment, and reputational injury;

•        Suppression of court access and procedural due process;

•        Chilling of future protected expression;

•        Financial loss from legal costs, time off work, and ongoing criminal proceedings.

**Relief Requested:**

Plaintiff respectfully requests that this Court enter judgment in his favor and award the following relief:

1.        Civil Rights Conspiracy that Defendants' conduct violated Plaintiff's First and Fourteenth Amendment rights;

2.        Compensatory damages against all named Defendants, jointly and severally;

3.      Punitive damages against each Defendant in their individual capacity for willful, malicious, and retaliatory misconduct;

4.      Reasonable costs and fees under 42 U.S.C. § 1988;

5.      Any other relief this Court deems just and appropriate under law and equity.

## COUNT VIII: Denial of Access to Courts & Retaliatory Forum Closure Under Color of Law

(Against Defendant STACIE KAYLOR in her individual capacity)

Addendum to Count II — Retaliatory Filing Ban by Judge Stacie Kaylor

12.      Plaintiff never had the opportunity to file a Motion to Disqualify Judge Stacie Kaylor in the underlying criminal proceedings — not because he chose not to, but because Judge Kaylor revoked Plaintiff's pro se filing rights before he ever appeared before her.

13.      This "preemptive strike" — a filing ban issued sua sponte, with no hearing, no written findings of frivolousness, and no record of abuse — was a retaliatory maneuver designed to:

•      Block Plaintiff from filing a verified motion to disqualify;

•    Shield Kaylor and the prosecution from constitutional scrutiny;

•    Prevent further exposure of institutional misconduct already detailed in the Verified Motion to Disqualify Judge Flynn;

•    Cut off Plaintiff's ability to participate in his own defense or raise further procedural and constitutional objections.

14.    The filing ban was not issued in response to courtroom disruption, improper conduct, or sanctionable filings — but instead was imposed immediately upon Kaylor's assignment to the case, and before any hearing involving Plaintiff had occurred.

15.    In response, Plaintiff prepared a Proposed Verified Motion to Disqualify Judge Kaylor, and submitted it to the United States District Court in his pending federal action (Polisi v. DeSantis, et al., Case No. 6:25-cv-00256 (M.D. Fla.)), along with a Motion for Judicial Transmittal, requesting the federal court transmit the motion to the state court for record preservation — because Plaintiff had been unconstitutionally barred from filing it himself.

16.    This chilling of court access, when combined with Judge Kaylor's subsequent denial of Plaintiff's jury trial request via ONI misclassification, amounts to a coordinated effort under color of law to suppress protected First

Amendment petitioning, deny procedural due process, and obstruct the judicial forum.

**COUNT IX Conspiracy to Deprive Civil Rights Under 42 U.S.C. § 1985(3) and Pattern of Post-Arrest Unauthorized Collection Attempts Reflecting Civil Dispute and Constructive Fraud**

(Against Defendants JAMES PATTERSON, BRIAN HAAS, VICTORIA AVALON, GRADY JUDD, JOHN B. FLYNN, STACIE KAYLOR, and JAMES UTHMEIER, in their individual capacities)

**Legal Basis:**

This Count arises under 42 U.S.C. § 1985(3), which prohibits conspiracies by two or more persons to deprive individuals of equal protection of the laws and privileges secured by the Constitution. The statute further requires proof of:

- A conspiratorial agreement or meeting of the minds;

- Overt acts in furtherance of the conspiracy;

- Intent to deprive the Plaintiff of equal protection or equal privileges;

- And that the acts injured Plaintiff or deprived him of legally protected rights.

**Protected Conduct:**

Plaintiff engaged in the following constitutionally protected activities:

- Filing of formal civil rights complaints, including Polisi v. DeSantis, et al.

- Submitting a pre-arrest legal memorandum ("The Olive Branch") identifying state misconduct and warning of imminent § 1983 liability;

- Exercising pro se litigation rights in family and criminal courts;

- Criticizing state officials, law enforcement misconduct, and judicial corruption.

These acts were the direct targets of the conspiratorial retaliation detailed below.

**Factual Allegations:**

**Pattern of Unauthorized Electronic Funds Transfer (EFT) Fraud by Alleged "Victim" Undermining Probable Cause and Establishing Constructive Fraud**

In the months following Plaintiff's arrest, based on perjurious and factually void allegations by hotel general manager James Patterson of Home2 Suites by Hilton

Orlando South Davenport, the very same establishment engaged in a sustained pattern of unauthorized electronic debit attempts against Plaintiff's financial accounts, in direct violation of federal and state law.

Specifically, no fewer than twelve (12) separate and unauthorized debit card charges were attempted against Plaintiff's CashApp Visa debit card between February 11, 2025, and July 13, 2025, all occurring after the date of Plaintiff's alleged "offense" and while the State's criminal prosecution remained pending.

These transactions:

•       Targeted the exact amount falsely alleged in the criminal affidavit ($467.76), often repeated verbatim on multiple dates.

•       Included manual "ratcheting" attempts, dropping the charge to $200.00 and then $150.00 within minutes, a hallmark of deliberate fund-harvesting behavior used to detect available balances.

•       Occurred on random, non-billing dates disconnected from any lawful stay, and despite Plaintiff's express revocation of authorization and the absence of any outstanding balance.

- Were previously disclosed by Plaintiff in court filings prior to the unlawful pro se filing ban imposed by Defendant Kaylor and known to prosecutorial actors, including Avalon and Haas, yet ignored.

Under 15 U.S.C. § 1693 et seq. (the Electronic Fund Transfer Act ("EFTA")), and applicable Regulation E under the Consumer Financial Protection Bureau, these repeated manual debit attempts constitute unauthorized electronic fund transfers. Moreover, such conduct gives rise to a pattern of civil and criminal liability based on the following legal doctrines:

- **Constructive Fraud** – Attempting to induce financial loss through deceptive, non-disclosed, or unauthorized access to Plaintiff's account, under color of pretextual billing;

- **Unjust Enrichment** – Seeking recovery of funds not legally owed or subject to adjudicated liability, while benefitting from prior full payment (as evidenced by Hilton's own zero-balance receipt);

- **Conversion** – Engaging in intentional and unlawful dominion over Plaintiff's financial property without legal claim or consent;

- **Abuse of Instrumentality** – Exploiting the EFT/payment system as a coercive collection mechanism in parallel with criminal prosecution,

circumventing lawful civil remedies such as small claims court or eviction proceedings;

•   **Attempted Electronic Theft** – Violating Florida criminal statutes including, but not limited to, § 812.014 (Theft) and § 817.568 (Fraudulent Use of Personal Identification Information), by attempting to charge known unauthorized cards tied to a known defendant in an ongoing criminal matter, without lawful justification.

This misconduct fits the federal industry term:

"**Digital Skip-Tracing Collection Fraud**" — a deceptive and predatory billing tactic in which merchants manually attempt successive charges at descending dollar amounts to capture any available balance, often on debit cards, bypassing consent, contract law, and dispute procedures.

Such conduct nullifies the foundational element of "probable cause" in the underlying criminal charge (which alleged nonpayment of the same $467.76) and exposes Patterson, and by extension, the State's entire criminal case, as participating in fraudulent conduct that is both civilly and criminally actionable.

That state actors, including Defendants Jimenez, Durden, Avalon, Haas, Kaylor, and Judd, continued the prosecution with knowledge of this misconduct, rather than dismissing the case or opening an investigation into Hilton's fraudulent

activity, which demonstrates not only willful blindness, but affirmative prosecutorial complicity in an unlawful retaliatory scheme.

1.      Defendant James Patterson, the general manager of Home2 Suites by Hilton Orlando South Davenport, participated in the conspiracy by providing knowingly false, incomplete, and misleading statements to Defendant Jimenez for inclusion in the probable cause affidavit. These statements omitted material facts already known to Patterson, including that Plaintiff had provided proof of payment and had personally contacted PCSO and also provided Cesar proof of payment to resolve any dispute.

6.      Notably, Patterson did not initiate any criminal complaint. He never contacted PCSO. Rather, Jimenez approached the hotel days after the event as part of a fishing expedition for prosecutable felonies. The record reflects that PCSO was not responding to a 911 call, a police report, or even a citizen complaint. This prosecution began as a self-initiated pretext, and Patterson, aware of the State's interest, gave perjured testimony to assist.

7.      In the months following Plaintiff's arrest and while the malicious prosecution remained pending, Defendant Patterson or agents acting under his direction at Home2 Suites initiated no fewer than twelve (12) successive,

unauthorized debit card transactions, targeting Plaintiff's account without legal justification or consent.

These attempts mirrored the exact dollar amount ($467.76) falsely alleged in the probable cause affidavit and, upon failure, decreased in value across multiple dates, demonstrating a deliberate pattern of electronic debit fraud designed to "ping" Plaintiff's financial accounts for any available balance.

This tactical reduction in amounts (e.g., $467.76 → $200.00 → $150.00 within minutes) is a hallmark of constructive fraud and bad-faith merchant conduct, often seen in illicit debt collection schemes. The fact that this conduct occurred while a criminal prosecution was pending based on Patterson's sworn testimony only further underscores its retaliatory and collusive character.

These transactions were not "automated billing" errors. Their timing, sequencing, and irregularity reveal manual, intentional access attempts by a merchant with no lawful debt and a pending motive to coerce, punish, or fabricate post-hoc justification for the criminal complaint.These collection attempts occurred without legal judgment, consent, or contractual right, confirming the civil nature of the dispute and Patterson's ongoing retaliatory participation.

8. This unlawful conduct — false testimony under oath, fraudulent collection activity, and collusion with prosecutors — establishes Patterson as a

private co-conspirator under § 1985(3). Eleventh Circuit precedent makes clear that private individuals can be liable under § 1983 and § 1985 when they act jointly with state officials to violate constitutional rights. Defendant Patterson engaged in the following acts forming the foundation of the conspiracy:

- Falsify the basis for arrest,

In the months following the arrest and while the criminal case remained pending, Patterson or his agents at Home2 Suites attempted no fewer than 12 unauthorized credit card charges to Plaintiff's account, all in amounts near or matching the original falsely alleged debt, and on random dates unconnected to any stay.

- Obstruct the truth,

- And actively collect on a "debt" he claimed under oath was never paid.

2. With the full cooperation of Defendant James Patterson, Defendants Brian Haas, Victoria Avalon, Grady Judd, Judge John B. Flynn, Judge Stacie Kaylor, and Attorney General James Uthmeier knowingly and intentionally coordinated a retaliatory campaign to suppress Plaintiff's protected activity, chill further speech, and neutralize civil exposure to the State of Florida and its political apparatus.

2.    The conspiracy was effectuated through a series of overt acts, including:

•    Advancement of criminal charges unsupported by probable cause, despite pre-arrest notice of exculpatory evidence;

•    Fabrication of a false affidavit (Jimenez), and issuance of a defective capias (Flynn) without valid service;

•    Retaliatory denial of release by Judge Shaffer, a named federal defendant;

•    Reassignment of the case to former Haas employees Flynn and Kaylor, despite known conflicts;

•    Flynn's refusal to rule on dispositive motions, sarcastic minimization of prosecutorial misconduct, and failure to withdraw capias;

•    Kaylor's invocation of a preemptive pro se filing ban, prior to ever presiding over Plaintiff's case, to prevent a Verified Motion to Disqualify;

•    Assignment of Avalon, Director of Civil Liability, to prosecute a 2nd-degree misdemeanor—whose own emails confirm the objective was not justice but protecting Haas from liability;

• Ongoing efforts by Home2 Suites, the supposed "victim," to collect debt through unauthorized credit card charges, while the State simultaneously prosecutes Plaintiff for "theft," indicating selective protection of corporate fraudsters.

3.    These acts demonstrate not only deliberate retaliation against Plaintiff but also invidious animus toward a known civil rights litigant, pro se filer, and whistleblower — a class protected under § 1985(3) and Eleventh Circuit precedent recognizing conspiracies to obstruct First Amendment rights and equal access to courts.

4.    Defendant Uthmeier, while not an active prosecutor, was repeatedly placed on written notice of these violations (including the fraudulent credit card attempts and witness fraud), and took no action. His silence and refusal to investigate constituted constructive ratification of the conspiracy and a willful breach of his statutory duties under § 1986. Further, though not applicable here, Plaintiff restates that he has been in active communication efforts with Defendant Uthmeier since shortly after his inauguration in February related to conferral attempts in *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP to avoid having to embarrass the governor with service by the US Marshals Service.

**Legal Violations:**

Defendants, acting under color of law and in conspiracy with one another, violated § 1985(3) by:

- Entering into a coordinated agreement to retaliate against Plaintiff;

- Targeting him for his civil rights advocacy and pending federal suit;

- Utilizing criminal process as a tool of punishment and civil exposure mitigation;

- Obstructing Plaintiff's access to state courts and federal relief;

- Suppressing exculpatory evidence and misconduct by their preferred "victim" (Home2 Suites).

**Resulting Harm:**

As a direct and proximate result of the § 1985(3) conspiracy, Plaintiff suffered:

- Retaliatory arrest and criminal prosecution;

- Suppression of his pro se access to court filings and defenses;

- Emotional distress, reputational damage, and lost economic opportunity;

- A chilling effect on protected speech and petitioning activity;

- Continued risk of incarceration and coercive plea pressures, in the face of knowingly falsified allegations.

**Relief Requested:**

Plaintiff respectfully demands:

- Compensatory damages against all named Defendants;

- Punitive damages against Defendants Haas, Avalon, Flynn, Kaylor, and Judd;

- Declaratory relief confirming that the conduct violated 42 U.S.C. § 1985(3);

- Costs and attorneys' fees under 42 U.S.C. § 1988;

- Any other relief the Court deems just and proper.

**Count X (Failure to Prevent Civil Rights Violations – 42 U.S.C. § 1986)**

James Uthmeier is sued in his individual capacity under 42 U.S.C. § 1986 for failing to prevent the well-documented conspiracy to retaliate against Plaintiff's protected speech and obstruct court access. Uthmeier:

- Received written, time-stamped notice from Plaintiff in both June 2024 (post-St. Cloud PD false arrest) and again in May 2025 via the "Olive

Branch" memo, alerting him to constitutional violations, prosecutorial retaliation, and anticipated § 1983 litigation;

• Possessed supervisory authority and operational oversight over Florida's law enforcement conduct and civil litigation response;

• Took no corrective action, no investigation, and no disciplinary intervention against the Office of State Attorney Brian Haas, despite being the top legal officer for the State of Florida;

• Permitted retaliatory actors such as Avalon, Durden, and Haas to continue advancing a prosecution after it was documented to him in writing that the arrest was based on a provably false affidavit, fabricated charges, and improper judicial process.

## COUNT XI: Supervisory Liability for Constitutional Violations Under 42 U.S.C. § 1983

**(Against Defendant Ron DeSantis, in his Individual and Official Capacities)**

This Count arises under 42 U.S.C. § 1983 and asserts that Defendant Governor Ron DeSantis, acting under color of law, is liable in both his individual and official capacities for the ongoing deprivation of Plaintiff's constitutional rights due to his

deliberate indifference and failure to act after receiving actual notice of systemic misconduct by state actors under his authority.

1.    Governor Ron DeSantis, as the Chief Executive of the State of Florida, bears constitutional and statutory responsibility for ensuring that state actors (law enforcement, prosecutors, and members of the judiciary) operate within the bounds of federal law and constitutional protections.

2.    Under 42 U.S.C. § 1983, a state official may be held liable where they had actual or constructive notice of constitutional violations and failed to act. See *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010); *Gonzalez v. Reno*, 325 F.3d 1228, 1234–35 (11th Cir. 2003) (supervisory liability triggered where failure to act amounts to deliberate indifference to known rights violations).

3.    Plaintiff provided Governor DeSantis with formal written notice of systemic judicial and law enforcement misconduct via certified mail beginning in June 2024, stemming from the events in *State v. Polisi*, 2023-MM-2683 (Osceola County). That notice documented:

•    False arrest and unlawful pretrial detention;

•    Suppression of Brady material;

•    Retaliatory prosecution and forum manipulation;

- Judicial misconduct by judges operating under DeSantis' appointment authority.

4. That initial notice was followed by direct pre-arrest conferral emails in May 2025, involving a second wave of unconstitutional conduct within Polk County, under the supervision of Sheriff Grady Judd and State Attorney Brian Haas, including:

- Fabricated probable cause;

- Unlawful arrests in violation of a void capias;

- Judicial conflicts, including a retaliatory ROR override by Judge Laura Shaffer, also a named federal defendant at the time;

- The assignment of conflicted judges with known prosecutorial ties to Defendant Haas, such as Judge John B. Flynn and Judge Stacie Kaylor.

5. Plaintiff's communications included not only legal argument and factual exhibits, but a formal waiver of liability offer, memorialized in writing and referred to as The Olive Branch, which included:

- A proposed general and mutual release,

- A covenant not to sue,

• And a documented path to resolution.

6. Despite receiving this roadmap to de-escalation—on top of prior federal litigation pending in *Polisi v. DeSantis, et al.*, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla.)—Governor DeSantis took no corrective action. He made no inquiry, no referral, and implemented no oversight measures concerning the clear, repeated violations taking place under the authority of his office.

7. This inaction was not benign. It was deliberate indifference. When a governor receives multiple written warnings of civil rights deprivations—including fabricated charges, unlawful arrests, judicial forum closure, and retaliatory conduct by his appointees—and remains silent, inaction becomes ratification.

8. Under *Ex parte Young,* 209 U.S. 123 (1908), a sitting governor may be sued in his official capacity for ongoing constitutional violations. Because Plaintiff's injuries are active, continuing, and systemic, sovereign immunity does not shield Defendant DeSantis from equitable or declaratory relief.

9. Defendant DeSantis' pattern of appointments—including individuals with known conflicts, prosecutorial entanglements, and public disciplinary records—reflects a conscious disregard for constitutional integrity within the judicial system. See *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1030–31 (11th Cir. 2001)

("a policy of inaction… may be the functional equivalent of a decision by the governmental entity itself to violate the Constitution").

10.    As a direct result of Governor DeSantis' inaction and continued endorsement of implicated actors, Plaintiff suffered:

• Multiple unlawful arrests under color of state law;

• Denial of pro se filing rights and access to court;

• Retaliatory judicial conduct from judges operating under his appointment authority;

• Financial and reputational injury stemming from malicious prosecution;

• Ongoing constitutional injury through systemic denial of liberty and due process.

**LEGAL VIOLATIONS[19]:**

To the extent Defendant Ron DeSantis is sued in his official capacity, Plaintiff seeks only prospective declaratory and injunctive relief to prevent the continuation of ongoing constitutional violations. This claim falls squarely within the exception to Eleventh Amendment immunity as established in *Ex parte Young*, 209 U.S. 123 (1908), and its progeny.

In his individual capacity, Defendant DeSantis is liable for monetary damages due to his deliberate indifference after receiving actual notice of civil rights violations by state actors under his authority, as outlined in *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

**Resulting Harm:**

As a direct and proximate result of Defendant Ron DeSantis' deliberate indifference and supervisory failure to intervene following repeated, formal notice:

---

[19]

- **Ex parte Young**, 209 U.S. 123 (1908) — injunctive/declaratory relief allowed against state officials.

- **Will v. Mich. Dep't of State Police**, 491 U.S. 58 (1989) — no damages against official-capacity state officers.

- **Hafer v. Melo**, 502 U.S. 21 (1991) — individual-capacity suits allowed for § 1983 violations.

- **Dodds v. Richardson**, 614 F.3d 1185 (10th Cir. 2010) — supervisory liability framework.

- Plaintiff was unlawfully arrested on multiple occasions, including under a facially void capias, in clear violation of the Fourth and Fourteenth Amendments;

- Plaintiff was subjected to extended unlawful detention, including denial of release despite ROR designation, obstruction of pretrial rights, and retaliatory extradition conducted by actors under Defendant's authority;

- Plaintiff's access to court was unconstitutionally suppressed via forum closure, pro se filing bans, and judicial misconduct carried out by judges appointed or retained by Defendant DeSantis, depriving Plaintiff of First and Fourteenth Amendment protections;

- Plaintiff suffered reputational and economic harm due to continued malicious prosecution and the public stigma of fabricated charges that Defendant DeSantis could have—and should have—acted to investigate or abate;

- Plaintiff was denied a fair tribunal in both civil and criminal forums, owing to the Defendant's sustained appointment and endorsement of judicial officers with known conflicts, disciplinary records, and prosecutorial entanglements;

• Ongoing injury persists, as Plaintiff remains under active criminal prosecution, subject to retaliatory conditions and constitutional deprivations that could have been prevented or mitigated through even minimal executive oversight;

• Plaintiff incurred emotional distress and psychological trauma, compounded by the knowledge that the highest state official, entrusted with constitutional fidelity, actively ignored his plight—despite being offered a documented off-ramp through "The Olive Branch" and formal pre-litigation conferral.

In sum: Defendant DeSantis' inaction was not administrative neglect—it was a systemic failure of constitutional duty that rendered him a knowing participant in the deprivation of rights under color of law.

**Relief Requested:**

11.    Plaintiff seeks:

• A declaratory judgment that Governor DeSantis' inaction constitutes deliberate indifference to known constitutional violations;

• A finding that his continued failure to act, intervene, or investigate has materially enabled the deprivation of federal rights under § 1983;

• All other relief as outlined in the Prayer for Relief, including prospective orders barring further ratification of retaliatory judicial and prosecutorial conduct.

## IV. JURY DEMAND

Plaintiff demands trial by jury on all triable issues.

## V. RESERVATION OF RIGHT TO AMEND

Plaintiff expressly reserves the right to amend this Complaint under Fed. R. Civ. P. 15 as additional facts or defendants become known.

## CONCLUSION

Plaintiff has presented a detailed, documented, and deeply troubling pattern of retaliatory abuse by state actors operating under color of law, across multiple jurisdictions, and under the apparent protection of supervisory officials who chose silence over accountability. From unlawful arrest to judicial manipulation, from retaliatory prosecution to calculated forum closure, the Defendants conspired— explicitly or tacitly—to punish Plaintiff for protected speech and lawful litigation.

What began as a citizen's effort to resolve a civil dispute through transparency and cooperation was transformed into a campaign of state retaliation, driven by ego,

politics, and the fear of civil liability. This is not merely misconduct. It is state-sponsored lawfare.

Each Defendant had a chance to course-correct. None did. What they chose instead was collusion, concealment, and coordinated suppression of rights guaranteed by the United States Constitution.

The federal courts were built for this very purpose: to halt the unchecked abuse of state power and to remind those in authority that no office, robe, or badge renders them immune from the Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, jointly and severally, and requests that this Court grant the following relief:

1. **Declaratory Relief**

A declaration that the acts and omissions of Defendants, as alleged herein, violated Plaintiff's clearly established rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and that said violations are ongoing and subject to judicial redress.;

2. **Compensatory Damages**

An award of compensatory damages in an amount to be determined at trial for:

- Unlawful arrests and seizures;

- Malicious prosecution;

- Retaliation for protected speech;

- Denial of court access and fair tribunal;

- Deprivation of liberty and parental rights;

- Emotional distress, reputational injury, and economic losses resulting from the acts of Defendants acting under color of state law.

3.   **Punitive Damages**

An award of punitive damages against all individual Defendants in their personal capacities, including but not limited to:

Ron DeSantis, Grady Judd, Victoria Avalon, Brian Haas, Laura Shaffer, John B. Flynn, Stacie Kaylor, Courtney Durden, and any other named individual Defendant whose conduct was willful, malicious, or in reckless disregard of Plaintiff's constitutional rights.

4.   **Attorneys' Fees and Costs**

Awarding all costs of this action, along with reasonable fees and pro se litigation-equivalent compensation pursuant to 42 U.S.C. § 1988 , and any other applicable provision of law.

### 5.    **Referral to Oversight Authorities**

Directing the Clerk of Court to transmit relevant findings or rulings to appropriate authorities, including:

- Florida Judicial Qualifications Commission,

- U.S. Department of Justice Civil Rights Division,

- Office of the Inspector General, and

- U.S. Attorney General Pam Bondi

for investigation into potential prosecutorial and judicial misconduct;

### 6.    **Prospective Injunctive Relief (limited and targeted)**

Pursuant to Fed. R. Civ. P. 65, *Pulliam v. Allen*, 466 U.S. 522 (1984), and *Mitchum v. Foster*, 407 U.S. 225 (1972), Plaintiff further respectfully requests:

- A narrowly tailored judicial order prohibiting ongoing retaliatory conduct by Defendants during the pendency of this action;

• A directive safeguarding Plaintiff's pro se filing rights in ongoing state proceedings, ensuring meaningful access to court and preservation of adversarial process;

• Any other prospective or structural relief necessary to prevent further chilling of Plaintiff's First and Fourteenth Amendment rights.

7. Jury Trial On All Triable Issues

8. Any Further Relief

Such other and further legal or equitable relief as this Court may deem appropriate to:

• Prevent continued retaliation;

• Restore the integrity of the judicial process;

• And remedy the systemic civil rights violations that gave rise to this action.

Respectfully,

/s/Vincent R. Polisi, II
Vincent R. Polisi, II
Plaintiff, Pro Se
8297 Champions Gate Boulevard, #113
Champions Gate, FL 33896
407-928-0967
vincent@vincentpolisi.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July, 2025, I served a true and correct copy of the foregoing complaint upon all named Defendants via electronic delivery to their known and previously used email addresses, consistent with prior notices and filings in this matter.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 1.08

I HEREBY CERTIFY that this document complies with the font and formatting requirements of Local Rule 1.08 of the United States District Court for the Middle District of Florida. It is submitted in 14-point Times New Roman font, double spaced with 1" margins.

## NOTICE REGARDING SERVICE and RULE 4(m) SERVICE DEADLINE

Pursuant to Federal Rule of Civil Procedure 4(m), Plaintiff acknowledges the 90-day deadline for service of process upon all named Defendants. Plaintiff is actively preparing USM-285 forms and exhibits for formal service by the United States Marshals Service and will file a separate motion under Rule 4(c)(3) requesting assistance from the Court to effectuate timely service.

Plaintiff respectfully notifies the Court that constructive notice and multiple pre-service communications have already been transmitted electronically to all known Defendants, and that formal service will be completed prior to the expiration of the Rule 4(m) deadline unless otherwise ordered.

## NOTICE OF RELATED CASE

Pursuant to Local Rule 1.07 and Fed. R. Civ. P. 10(c), Plaintiff identifies a related case currently pending before this Court:

***Polisi v. DeSantis, et al.***, Case No. 6:25-cv-00256-WWB-LHP (M.D. Fla.)

This action involves overlapping parties, substantially similar factual allegations, and common constitutional violations arising from the same series of events. Judicial economy, consistency of rulings, and preservation of judicial resources support acknowledgment of the related nature of these proceedings. Accordingly, Plaintiff respectfully provides notice of this related matter.

## VERIFICATION UNDER 28 U.S.C. § 1746

I, Vincent R. Polisi, II, hereby declare under penalty of perjury pursuant to 28
U.S.C. § 1746 that the foregoing Complaint and all factual statements contained
therein are true and correct to the best of my knowledge, information, and belief.
Further, in the interest of judicial economy, once CMF/ECF filing rights are
granted, a formal Notice of Verification for all past and future filings will be
incorporated into the federal record.

Executed on this 14th day of July, 2025.


Respectfully submitted,


/s/ Vincent R. Polisi, II
Vincent R. Polisi, II
Plaintiff, Pro Se

**Exhibit Index**

**Exhibit A – "The Olive Branch" Memorandum**

Plaintiff's formal pre-arrest conferral and waiver-of-liability offer to Defendants, dated Ma 1, 2025.

**Exhibit B – Pre-Litigation Letter Pursuant to Fed. R. Evid. 408**

Confidential settlement communication establishing Defendants' knowledge and opportunity to cure.

**Exhibit C – Judicial Notice Filed June 30, 2025**

Supplemental Judicial Notice submitted in *Polisi v. DeSantis, et al.*, documenting ongoing retaliation and forum closure.

**Exhibit D – CashApp Statement Showing Hotel Charge**

Debit transaction corroborating payment of alleged "stolen" hotel funds used in criminal prosecution.

**Exhibit E – Zero-Balance Receipt from Home2 Suites / Hilton**

Hilton-issued document proving no outstanding balance and full resolution of civil billing matter.